UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ANYA JUAN RISCO,

                             Plaintiff,

                  v.

JOHN M. McHUGH, Secretary of the Army,

                           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10 Civ. 6314 (CS)

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PREET BHARARA
United States Attorney for the
Southern District of New York
Attorney for Defendant
86 Chambers Street, 3d Floor
New York, NY  10007
Telephone: (212) 637-2718
Facsimile: (212) 637-2786
david.bober@usdoj.gov

DAVID BOBER
Assistant United States Attorney
– Of Counsel –

Defendant John M. McHugh, Secretary of the Army ("Defendant" or the "Army"), respectfully submits this memorandum in support of the Army's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

## PRELIMINARY STATEMENT

In September 2008, plaintiff Anya Juan Risco ("Plaintiff" or "Risco") began her employment as a probationary guidance counselor intern at the United States Military Academy Education Center in West Point, New York ("West Point"). Shortly after arriving at West Point, Risco, who is a dark-skinned Hispanic woman, began to exhibit erratic behavior, including stating that her co-workers should be slapped, calling her co-workers unusual nicknames, and sending emails in which she accused her co-workers of gossiping about her and her supervisors of reading her emails. Approximately eight months after she started, in May 2009, Risco's supervisors – the same people who made the decision to hire her in September 2008 – determined that her behavior was disrupting the workplace, and placed her on paid administrative leave pending a decision whether to terminate her from the internship program. In July 2009, Risco was terminated during her probationary period for failure to demonstrate fitness and qualification for continued employment. Approximately one year later, after an EEO investigator found no evidence of discrimination, Risco filed this complaint, alleging that the Army violated the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), by discriminating against her on the basis of her race, color, and actual or perceived disability. She also alleges that the Army retaliated against her for engaging in protected activity.

This Court should grant summary judgment to the Army. First, Risco's racial discrimination claim fails because there is no evidence that would permit an inference of discrimination on the basis of race or color. Indeed, Risco admits that neither her co-workers nor her supervisors ever directed

negative comments toward her on the basis of her race or color.  Nor can she identify any similarly situated employee of a different race or color who was treated differently than she was.  Rather, her racial discrimination claim rests entirely on the fact that she was the only dark-skinned Hispanic employee in her office, but the Second Circuit has consistently rejected attempts by plaintiffs to base discrimination claims on that fact alone.  That is particularly so where, as here, the termination decision is relatively close in time to the hiring decision, and the hire/fire decisions were made by the same people.

Second, Risco's claim of disability discrimination fails because she cannot show that she was discriminated on the basis of a disability.  Although Risco alleges that she suffered from heart and knee conditions, she readily admits that her conditions did not affect any major life activities, and that she is able to walk, talk, bend, lift up to 35 pounds, sit for long periods of time, see, hear, interact with people, jog for five or ten minutes, use stairs, and exercise.  Indeed, she testified repeatedly that her purported medical conditions did not affect her ability to do her job in any way.  Moreover, putting aside the issue of whether Risco is disabled within the meaning of the anti-discrimination laws, Risco was never refused an accommodation nor denied permission to take time off from work during working hours to attend doctor appointments.

Third, to the extent Risco attempts to pursue a claim based on a hostile work environment, the harassment she allegedly endured was not sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.  Finally, Risco's retaliation claim fails because she cannot show that she participated in protected activity prior to the decision to terminate her employment, or that the decisionmaker was aware of her protected activity.  Rather, the record demonstrates that the Army had legitimate, non-pretextual reasons for terminating Risco's

employment, and made the decision to terminate her before she engaged in protected activity. Accordingly, the Army is entitled to summary judgment on all claims.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

**A.      Risco Is Hired as a Probationary Guidance Counselor Intern**

Risco began her employment with the Army on September 28, 2008, when she was appointed to a probationary position as a Guidance Counselor Intern, U.S. Army Civilian Training Education Development System ("ACTEDS"),[1] assigned to the United States Military Academy, West Point, New York.  *See* Bober Declaration[2] Exhibit A (Employee Information Printout), Exhibit B (August 31, 2011, Deposition of Anya Juan Risco ("Risco Depo.") at 18:2-4).    As a guidance counselor intern, Risco was responsible for assisting military personnel stationed at West Point with pursuing educational opportunities available to them through the Army; as Risco put it, her job duties consisted of "greeting the military members and their family members, gathering information for them and putting them in the Go Army Education database, [and] seeking or researching the different schools that were available" to them.   Risco Depo. 19:6-15.   Her first-line supervisor was David Byrd (a Caucasian male), the Director of the Education Center, and her second-line supervisor was

---

[1]  ACTEDS is a centrally managed Department of the Army civilian training system.   ACTEDS recruits, vets, and selects candidates for the guidance counselor intern career program that Risco participated in, (Bober Declaration Exhibit C (FFC Tr. 29:15-30:4)), and then provides a list of candidates to managers at available assignment locations and the manager then makes a selection from the list of approved candidates.   (*Id.* 30:11-17.).   References to "FFC Tr." are to the transcript of a fact-finding conference conducted on September 10, 2009, at the Army's Equal Employment Opportunity Office in West Point, New York.   At conferences before the Court, Risco's attorney has indicated that he chose not to take depositions of the Army's employees and instead rely on their testimony from this fact-finding conference.

[2]  References to "Bober Declaration" are to the December 13, 2011, Declaration of David Bober, filed concurrently with this memorandum.

Michael Bilello (also a Caucasian male), the Director of Human Resources. *Id.* 23:14-24. Risco's appointment was subject to the completion of a one-year initial probationary period, the purpose of which is to determine the fitness of an employee for the position. *See* 5 C.F.R. § 315.803. Federal regulations provide that if an employee's work performance or conduct does not demonstrate that she is fully qualified to perform the duties of her position, she can be terminated during this probationary period. 5 C.F.R. §§ 315.803-804.

The office in which Risco worked included Risco, Byrd, guidance counselors Nancy Judd (Caucasian female) and Neil Sakumoto (Asian male), and an information technology employee, Frank Delaurentis (Caucasian, Male). *See* Bober Declaration Exhibit C (FFC Tr. 38:1-040:20); Risco Depo. 25:15-26:4. The office also included two test administrators (Victoria McPeak and Ramona Meese, both white females, *see* Risco Depo. 26:5-13) and a number of college admission representatives (Karen Riley, Elizabeth McKillop, Gwen Wallace, and Marybeth Liggett, all white females, *see* Risco Depo. 26:14-27:4).

## B.    Risco's Erratic Behavior

Soon after arriving at West Point, Risco began to exhibit unusual and erratic behavior that escalated over time and repeatedly resulted in counseling or admonitions from her supervisors. For example, Risco began to refer to coworkers and superiors by pet names, such as "Aunties," "Papa," and "Don." *See* FFC Tr. 244:1-246:5; Risco Depo. 86:7-24; 87:17-88:24. This resulted in Risco receiving counselor from Bilello that use of pet names in a professional setting was inappropriate. FFC Tr. 244:1-245:19. On another occasion, Risco, apparently offended when a coworker asked Byrd what his wife thought of him attending a training conference in Hawaii with Risco, stated that "where I [Risco] come from, she [the coworker] would be disciplined by her mother, father, brother,

sister, she would be slapped by her mother, brother, father, sister." Risco Depo. 96:14-23. *See* FFC Tr. 144:10-21. This led to counseling from her supervisor on not resorting to threats of physical violence in the workplace. *See* FFC Tr. 144:6-7.

On March 8, 2009, Risco sent an e-mail to Byrd stating that she was "overwhelmed" with her assigned tasks, and that her "current health issues" were affecting her productivity level. Bober Declaration Exhibit D. In response, Byrd explained that he was exposing her to a broad range of situations and tasks that she would encounter as a guidance counselor upon completion of her internship, and that her workload was only a fraction of that of others in the Education Center. *Id.* Byrd further explained that he was sincerely trying to help her and wanted her to succeed. *Id.*

On March 22, 2009, Risco sent an e-mail to Byrd, Bilello, Sakumoto, DeLaurentis, and Judd, with the subject heading "Proffessionalism [sic] and Etiquette in the Workplace," recounting how she had "observed many departments . . . diminish their professionalism, productivity and positive work environment due to malicious gossip." Bober Declaration Exhibit E. She further stated her hope that her co-workers – the recipients of her email – "are far too superior and professional to engage in gossip." *Id.* After receiving this e-mail, several of Risco's coworkers reported to Byrd that Risco's accusatory email had adversely affected their working environment. Bober Declaration Exhibit F. Byrd once again counseled Risco, informing her that that the e-mail was accusatory and inappropriate. *See* FFC Tr. 129:12-18.

On March 24, 2009, after meeting with an EEO counselor to request information on rules and regulations affecting disabled workers, Risco e-mailed Byrd and Bilello, without explanation, informing them that she was "submitting her two-week resignation letter." *See* Bober Declaration Exhibit G. In a separate email sent the same day, Risco notified an EEO counselor that she "finally

6

decided to follow [her] conscious [sic] and resign!," again without explanation.  Bober Declaration Exhibit H.  However, three days later, on March 27, 2009, Risco again emailed Bilello and Byrd, this time to tell them that she was rescinding her resignation.  Bober Declaration Exhibit I; Risco Depo. 114:5-6.  But the strange behavior did not stop; on April 24, 2009, for example, Risco sent an e-mail to Bilello requesting Army regulations on monitoring civilian personnel email accounts because she believed Byrd was accessing her account.  Bober Declaration Exhibit J.

Against this backdrop of erratic behavior, Byrd discussed with Bilello terminating Risco for conduct-based reasons in late March or early April 2009, stating that her inappropriate behavior was escalating and efforts to correct it through counseling had proven ineffective.  FFC Tr. 368:2-8, 461:8-462:9.  In the course of these discussions, Byrd, at the urging of Bilello and other higher-ups within his chain of command, decided to obtain statements from coworkers documenting Risco's behavior.  *See* FFC Tr. 279:7-11; 466:8-467:20.  The coworkers documented various incidents wherein Risco exhibited odd, inappropriate behavior and expressed how Risco's behavior negatively impacted the Education Center work environment.  One statement, for example, submitted by Nancy Judd, a guidance counselor at the Education Center, recounted how Risco had stated that she wished Byrd had attended a psychodrama training session so that Risco could "act out" slapping him.  Bober Declaration Exhibit F.  Judd stated that she found that comment unusual and aggressive, *id.*, and also recounted how Risco insisted on calling her co-workers by pet names despite repeated requests to stop, *id.*  Another statement, written by Marybeth Leggett, a Long Island University Academic Advisor who regularly worked with West Point Education Center Guidance Counselors, recounted how Risco contacted the president of Long Island University directly to express her dissatisfaction and demand immediate resolution of financial issues that Risco was experiencing with her personal

enrollment at there.  Bober Declaration Exhibit F.  Leggett concluded that Risco often "interjects herself into conversations and situations that she knows little of" and "jumps into the situation without listening to the direction she is given."  *Id.*  Leggett further stated that Risco's conduct "results in unsatisfactory customer service."  *Id.*

## C.    Risco's Termination During the Probationary Period

On May 1, 2009, Byrd sent a memo to the West Point Garrison Commander in which he recommended that Risco be terminated from the intern program based upon inappropriate behavior and concern as to her ability to successfully complete the program.  Bober Declaration Exhibit K. Byrd cited a number of examples of the bizarre behavior described above, and several more, including an incident in which Risco mocked him for shoveling snow; several incidents in which Risco disregarded his instructions about accessing customer databases; inappropriate references to the Ku Klux Klan and women being bad drivers; and an incident in March in which Risco left several unusual, rambling voicemail messages for Byrd and Bilello.  *Id.*  On May 7, 2009, Risco sent a memo to Bilello, requesting that he transfer her from the Education Center, and complaining that Byrd had subjected her to discrimination and retaliation.  *See* FFC Tr. 34:16-35:8; 42:1-17; 116:11-117:12; Bober Declaration Exhibit L.  *Id.*   On May 14, 2009, Byrd placed Risco on paid administrative leave pending the termination decision.  *See* FFC Tr. 854:13-855:4; Risco Depo. 59:13-15.

Approximately three weeks later, Colonel Daniel Bruno, Deputy Commander, and Wilfred Plumley, Deputy Garrison Commander, directed Byrd and Bilello to return Risco to work from administrative leave because she had not been provided with performance standards.  FFC Tr. 401-402.   Plumley directed Byrd to provide Risco with written counseling based only upon her

performance and to place her on performance standards.  FFC Tr. 401:10-402:17, 617:10-618:8.  On

May 29, 2009, at Plumley's direction, Bilello provided Risco with a written counseling statement.

*See* Bober Declaration Exhibit M; FFC Tr. 620:7-13; Risco Depo. 147:25-148:9.  The counseling

statement laid out the expectations for Risco's return to work, including adhering to established work

schedules and following proper leave procedures, continuing work under the path laid out in the

Individual Development and Master Training Plans until she received her performance standards,

taking direction from and interacting respectfully with her supervisors and colleagues, and correcting

her signature block to accurately reflect her position.  Bober Declaration Exhibit M.

On June 5, 2009, Bilello provided Risco with a second written counseling statement, which

had been prepared by Byrd.  Bober Declaration Exhibit N; FFC Tr. 621:10-20.  The statement

counseled Risco for making threatening statements and failing to follow supervisory instructions.  *Id.*

On July 10, 2009, Ilene Rogers, the director of the Army Continuing Education System, terminated

Risco from the internship program.  Bober Declaration Exhibit O; *see also* FFC Tr. 922:16-923:4.

Based upon Risco's behavior documented in Byrd's May 1, 2009, memorandum recommending her

termination, including the Education Center employee statements (FFC Tr. 940:12-17),  and after

speaking to Byrd (FFC Tr. 909:6-18) and Risco (FFC Tr. 942:18-20), Rogers determined that

termination was proper because Risco was not a suitable intern for the career program.  Bober

Declaration Exhibit O; FFC Tr. 922:22-923:4.  Rogers testified that at the time she made the decision

to terminate Risco, she was unaware that Risco had filed a discrimination or retaliation complaint

with the EEO, or otherwise had alleged that Byrd had discriminated or retaliated against her.  *See* FFC

Tr. 943:21-946:11, 949:5-950:7.

**D.     Risco's Contacts with the Army EEO Office**

Risco's first contact with the West Point EEO office was in March 2009.  Risco Depo. 34:20-23, 35:9-12. As Risco described it, the purpose of her visit was to "seek[] information about disabled workers working for the government," and to obtain "the rules and regulation[] for the disabled workers in the workplace."  *Id.* 35:18-23.   At that point, she did not believe that anyone was discriminating against her.  *See id.* 40:6-9. (Q: "Do you have any complaints of the way you were treated prior to going to the EEO in March of 2009?  A. No, sir.").   Approximately two months later, on May 15, 2009 (the day after she was placed on administrative leave), Risco again contacted the West Point EEO office, and made an informal complaint to the effect that Byrd had subjected her to harassment since February 2009, and that her placement on paid administrative leave was on account of her race/color and actual/perceived disability.  Bober Declaration Exhibit P.  On June 26, 2009, Risco filed an EEO Formal Complaint of Discrimination, alleging that her supervisors subjected her to discrimination and harassment because of her race (Hispanic), color (Brown) and disability (osteoarthritis/cardiac impairments/perceived mental disability).  Bober Declaration Exhibit Q. After investigating the complaint and holding a hearing, on May 28, 2010, the EEO Compliance and Complaints Review office issued the Army's Final Agency Decision, finding that Risco was not the victim of discrimination or reprisal.  Bober Declaration Exhibit R.  This lawsuit followed.

## ARGUMENT

**A.     <u>Legal Standards Applicable to Motions for Summary Judgment</u>**

Summary judgment should be granted where the pleadings, deposition, answers to interrogatories and admissions on file, together with affidavits, if any, show "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56(a).  In ruling on a motion for summary judgment, the district court is required to "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment."  *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006).  "'Summary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to other areas of litigation.'"  *Lu v. Chase Inv. Serv. Corp.*, 412 Fed. App'x 413, 415 (2d Cir. Mar. 8, 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000)).  Indeed, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases."  *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004).  In that regard, "courts 'must . . . carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture. "  *Fall v. New York State United Teachers*, 289 Fed.Appx. 419, 420 (2d Cir. 2008) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)); *Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'Purely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy employee's burden on a motion for summary judgment.) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

**B.**     ***McDonnell Douglas* Analytical Framework for Discrimination and Retaliation Cases**

Where, as here, the plaintiff has no direct evidence of discrimination or retaliation, the Court must apply the three-part proof scheme outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As outlined in *McDonnell Douglas*, first, the plaintiff must demonstrate a *prima facie* case of discrimination.  Second, if the *prima facie* case is established, an inference of discrimination arises that may be rebutted by an employer on a showing of legitimate, non-discriminatory reasons for the

adverse employment actions. *Id.* Third, if the employer makes this showing, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reasons for the adverse employment action are pretextual. *McDonnell*, 411 U.S. at 804.

**C.     Risco Cannot Show Circumstances that Would Be Sufficient to Permit an Inference of Discrimination on the Basis of Race or Color**

To establish a *prima facie* case of discrimination, a plaintiff "must show: (i) membership in a protected class; (ii) qualifications for the position; (iii) an adverse employment action; and (iv) circumstances surrounding that action giving rise to an inference of discrimination." *Collins v. New York City Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (internal quotation marks and citations omitted). Here, there is no evidence in the record to support Risco's claim that her supervisor subjected her to discrimination based upon her race/color.

Risco has proffered no evidence that would support such an inference. First, Risco conceded during her EEO proceedings that neither Byrd nor any of her coworkers ever said anything negative about her based upon her race/color:

> Q:    Did any employee in the [Army] ever say anything negatively in your presence regarding your race or color or national origin?
>
> A:    No.
> . . .
> Q:    Mr. Byrd and Mr. Bilello never said anything directly to you derogatory in nature regarding your race or color?
>
> A:    No.
>
> Q:    And you didn't hear it second hand or third hand that anybody was speaking about you in a negative or derogatory way regarding your race or color?
>
> A:    No.

FFC Tr. 257:21-258:20.

12

Second, the only negative remarks that Risco alleges that any of her supervisors or employees made about race or color at all are (1) an alleged statement by Byrd (which Byrd has denied making) that he hoped Senator Obama would not be elected president because he would retaliate against white people, Risco Depo. 55:18-56:22, and (2) an unspecified disparaging remark by Byrd about Asians (which Byrd also denies), Risco Depo. 57:11-58:6.  But the Second Circuit has "long held that stray comments of this variety do not create an inference of discrimination." *Dixon v. International Federation of Accountants*, 416 Fed. Appx. 107, 110 (2d Cir. 2011); *see also Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."); *Fried v. LVI Servs., Inc.*, No. 10 Civ. 9308 (JSR), 2011 WL 4633985, at *9 (S.D.N.Y. Oct. 4, 2011) (finding that comment that referenced plaintiff's age was "stray remark" insufficient to raise inference of age discrimination).

Finally, there is no evidence that Risco was subjected to disparate treatment based on her race or color.  "A showing of disparate treatment-that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside [her] protected group-is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (internal quotation marks and citation omitted). Risco is unable to identify any employee outside her protected class at the West Point Education Center who was similarly situated and treated more favorably than her.  Indeed, there was no similarly situated employee, because Risco was the only guidance counselor intern.  *See* Risco Depo. at 24:14-16.

Rather, Risco attempts to rely on the fact that she was the only dark-skinned person in her

office.  *See, e.g.*, Risco Depo. at 77:11-14 (Q: What makes you think it had anything to do with your race or your color? A: Because, once again, I was the only one working there with dark skin."); *id.* at 55:20-21 (Q: Why do you think his conduct was related to your race?  A: I was the only one of dark skin color working in the office.").  But courts have continually rejected attempts to draw an inference of discrimination from the fact that the plaintiff was the only minority in the workplace.  *See, e.g.*, *Ghent v. Moore*, 519 F. Supp. 2d 328, 338-39 (W.D.N.Y. 2007) ("Without other evidence of discrimination," fact that plaintiff was sole African-American faculty member "is not probative of unlawful discrimination"); *Davis v. Oyster Bay-East*, No. 03-CV-1372, 2006 WL 657038, at *10 (E.D.N.Y. Mar. 9, 2006) ("[T]he mere fact that Plaintiff was the only African American stenographer, without more, is insufficient to establish pretext."); *Washington v. Martinez*, No. Civ.A. 03-3529, 2004 WL 632705, at *6 (E.D. Pa. Jan. 28, 2004) ("Although plaintiff was the only African-American in the office she has presented no evidence that she would have been treated differently had she been a white person or that any of her coworkers' actions were motivated by her race."); *Padob v. Entex Information Serv.*, 960 F. Supp. 806, 813 (S.D.N.Y. 1997) ("the fact of [plaintiff] being the only woman Corporate Sales Manager in her position, standing alone, does not create a genuine issue of material fact as to pretext based on gender"); *Walker v. Marriott Facilities Mgmt.*, No. 95-3273, 1995 WL 481511, at *2 (E.D. Pa. Aug. 11, 1995) ("Plaintiff merely asserts that he 'was the only black person employed in a management capacity in his unit.'  He does not allege that similarly situated persons outside the protected class were retained . . . . Thus, Plaintiff has not stated a claim of race or gender based discrimination.").

Because Risco cannot proffer any evidence that gives rise to an inference of discrimination, the Army is entitled to summary judgment on this claim.

14

**D.     Risco Cannot Show She Was Disabled or That She Was Subjected to an Adverse Action Because of Her Disability**

In addition to her race discrimination claim, Risco maintains that she was also discriminated against on the basis of a disability, which she has described as osteoarthritis, hypertension, and coronary artery disease.  *See* Complaint ¶ 13.  There is no evidence in the record to support this claim. Risco's testimony establishes that her medical conditions did not limit her major life activities and did not affect her ability to do her job; further, she concedes that she was never denied an accommodation or permission to leave work during normal working hours to attend doctor appointments.  Accordingly, the Army is entitled to summary judgment on the claims of disability.

To establish a *prima facie* case of discrimination in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), a federal employee must show:  (1) that she is disabled within the meaning of the Act; (2) that she is otherwise qualified to perform the job; and (3) that she was subjected to an adverse action because of her disability.  *See Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003) (citation omitted).

As an initial matter, Risco was not disabled within the meaning of the Rehabilitation Act[3] as amended by the Americans with Disabilities Amendment Act of 2008 ("ADAAA").  Under the ADAAA, disability is defined as, "(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual; (ii) A record of such an impairment; or (iii) Being regarded as having such an impairment as described in paragraph (l) of this section.  This means that the individual has been subjected to an action prohibited by the ADA as amended because

---

[3]  "[T]he Rehabilitation Act and the ADA impose identical requirements," and therefore case law applying the ADA [and ADAAA are] applicable to claims under the Rehabilitation Act.  *See Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999).

of an actual or perceived impairment that is not both "transitory and minor." 29 CFR § 1630.2(g).
Factors included in determining whether the limitation is substantial include: "(i) [t]he nature and
severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he
permanent or long term impact, or the expected permanent or long term impact of or resulting from
the impairment." *Miller v. McHugh*, --- F. Supp.2d ----, 2011 WL 4091466, *6 (S.D.N.Y. September
14, 2011) (citations omitted).  Although Risco has been classified as a disabled veteran by the
military, there is no evidence in the record that she has an impairment which substantially limits one
or more major life activities as required under the Act.  To the contrary, Risco maintains that her
osteoarthritis and cardiac conditions do not substantially impair any of her life activities.  *See* FFC
Tr. 60:2-63:14, 191:7-196:18.  At Risco's EEO hearing, for example, she maintained that the "only
limitations" caused by her medical conditions were her inability to do "heavy lifting" or "run[] a
marathon" – activities that are beyond the capabilities of most people.  She went on to explain that
"I can walk, I can talk, I can bend.  I can lift up to what, 35 pounds.  I can sit for long periods of
time." FFC Tr. 193:5-7.  Risco has maintained that her medical conditions do not affect her ability
to see (*id.* 193:10-11), hear (*id.*), interact with people (*id.* 193:17-20), jog for five or ten minutes (*id.*
194:4-5), use stairs (*id.* 195:12-16), and exercise (*id.* 191:19-20).

   Nor can Risco establish that she suffered any adverse employment action as a result of her
disabilities. An adverse employment action under the Rehabilitation Act, just as under other
employment discrimination statutes, is a "materially adverse change in the terms and conditions of
employment." *Nakis v. Potter*, 422 F. Supp. 2d 398, 419-20 (S.D.N.Y. 2006) (treating the definition
of an adverse employment action under Rehabilitation Act identically to the definition of an adverse
employment action under Title VII); *Ferrer v. Potter*, No. 03-CV-9113 (AJP), 2005 WL 1022439,

16

at *9 n. 8 (S.D.N.Y. May 3, 2005) (same).  To be "materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).

Risco alleges Byrd first discriminated against her on the basis of her actual/perceived disability in March 2009 after she went to see the EEO Counselor by no longer communicating with her or providing proper guidance.  Risco Depo. 39:1-40:9.  Even taking these allegations as true, they do not rise to the level of materially adverse changes in work conditions required to establish a disability discrimination claim.  Indeed, Risco testified that she was never denied permission to take leave from work to attend her medical appointments.  FFC Tr. 68:14-17; Risco Depo. 52:7-8.  And she alleges that her termination (which would be an adverse employment action) was not a result of discrimination on the basis of disability, but in retaliation (a claim that is also fatally flawed, as explained below).  Risco's inability to show that she suffered from, or was regarded as having, a disability within the meaning of the Rehab Act or that she was subjected to an adverse action because of a disability entitles the Army to summary judgment on Risco's disability discrimination claim.

**E**.      **Risco Was Not Subjected to a Hostile Work Environment**

Risco also cannot established that she was subjected to a hostile work environment. To establish a hostile work environment case, a plaintiff must demonstrate: (1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.  *See Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).  A hostile work environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to

create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004). While Risco may have subjectively perceived her work environment as hostile, her hostile work environment nonetheless fails because she cannot show the environment was objectively hostile.

Risco's complaints about her treatment in the workplace boil down to a series of petty slights and stray remarks.  Apart from the stray remarks described above about Senator Obama, an unspecified disparaging remark about Asians, and her supervisor's comment that her problems were "probably mental," Risco provides no evidence of a general atmosphere permeated with race, color, or disability intolerance, and cannot point to a single discriminatory remark.  The only other incidents that Risco was able to identify regarding her allegedly hostile treatment were that her keys to the building were not returned to her when she returned from administrative leave, *see* Risco Depo. 117:1-6, and her co-workers were generally uncommunicative, *id.* 116:21-23.

Assuming all of these incidents happened as Risco says they did, they fail to rise to the level of a hostile work environment as a matter of law.  As a threshold matter, there is no evidence that any of the alleged incident occurred because of Risco's race, color, or disability.  *See Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) ("[I]t is 'axiomatic' that in order to establish a [race or disability]-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct occurred because of her [race or disability].)."  Regardless, these types of petty incidents are not sufficiently severe or pervasive to alter the terms and conditions of Risco's employment.  As the Supreme Court has explained, Title VII "does not set forth a general civility code for the American workplace"; thus, "normal petty slights, minor annoyances, and simple lack of manners" do not create an actionable hostile work environment claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548

18

U.S. 53, 68 (2006).  Thus, courts in this district have consistently granted summary judgment on hostile work environment claims involving similar petty slights – specifically noting that claims consisting of "offensive utterances" and "uncivil treatment" are insufficient.  *Buckman v. Calyon Secs.*, __ F. Supp. 2d __, 2011 WL 4153429, at *9-10 (S.D.N.Y. Sept. 13, 2011); *see also id.* (granting summary judgment to defense on hostile work environment claim where the plaintiff complained that he was "singled out for punishment" and generally treated with hostility). Accordingly, the Army is entitled to summary judgment on Risco's hostile work environment claim.

**F.**     **Risco's Discrimination Claims Are Undermined by the Same Actor Inference**

Risco's discrimination claims are additionally weakened by what is known as the "same actor inference," *i.e.*, she was hired and her termination was recommended by the same person, Byrd, within a relatively short period of time.  "The Second Circuit has held that certain circumstances surrounding termination decisions strongly suggest that invidious discrimination was unlikely, including when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to him [or her] an invidious motivation that would be inconsistent with the decision to hire.  This is especially so when the firing has occurred only a short time after the hiring."  *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 329-30 (S.D.N.Y. 2007) (internal quotation marks and citations omitted), *aff'd*, 303 Fed. App'x 946 (2d Cir. 2008).  Although he was not the ultimate decisionmaker with regards to her termination, Risco contends that Byrd discriminated against her by recommending her termination.  It is undisputed that Byrd made the final decision to select Risco for the intern position at West Point in September 2008 (FFC Tr. 30:3-17; Risco Depo. 17:19-23), and then recommended her termination only seven months later on May 1, 2009 (Bober Declaration Ex. _).  Moreover, Risco concedes that Byrd did not discriminate against her during her

first six months at West Point.  Risco Depo. 48:16-19.  Therefore, the 'same actor' inference applies here to further cast doubt on any potential inference of invidious discrimination in Risco's termination.  *See Anderson*, 507 F. Supp. 2d at 330.

**G.**  **Risco Cannot Establish That She Was Subjected to Retaliation for Participation in Prior Protected Activity.**

Risco appears to allege that her probationary termination was effected in retaliation for her EEO activity.  *See* Complaint ¶ 47.  To establish a prima facie case of retaliation, a plaintiff must show: (1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action.  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 608 (2d Cir. 2006).  Risco cannot establish a causal connection between her protected activity and her termination because she first participated in protected activity after management had decided to seek to terminate her employment.

Risco's first contact with the Army EEO office was in March 2009, Risco Depo. 34:20-23, 35:9-12; however, this visit was not "protected activity" within the meaning of the anti-discrimination laws because, as Risco described it, the purpose of her visit was to "seek[] information about disabled workers working for the government," and to obtain "the rules and regulation[] for the disabled workers in the workplace."  Risco Depo. 35:18-23.  Indeed, at that point, she did not believe that anyone was discriminating against her, on the basis of her disability or otherwise.  *See id.* 40:6-9. (Q: "Do you have any complaints of the way you were treated prior to going to the EEO in March of 2009?  A. No, sir.").

This visit to the EEO office does not qualify as protected activity because "the term 'protected

activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Bryant v. Verizon Commc'ns Inc.*, 550 F. Supp. 2d 513, 537 (S.D.N.Y. 2008) (citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000)).  "The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment due to his membership in a protected class and that he is not complaining merely of unfair treatment generally." *Aspilaire v. Wyeth Pharms., Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009) ("While plaintiff may have believed that she was the victim of discrimination, an undisclosed belief of such treatment will not convert an ordinary employment complaint into a protected activity.").  As Risco concedes that she was not complaining of discrimination when she met with the EEO Counselor in March 2009, her initial contact with the EEO Office was not protected activity under Title VII.

Rather, EEO records establish that Risco's first informal complaint of discrimination was lodged on May 15, 2009 – after she had already been placed on administrative leave, after her co-workers had already written memos to Byrd complaining of her erratic behavior, and after Byrd had already recommended to the Garrison Commander that she be terminated.  Given that the process that led to Risco's termination was already underway, she cannot prevail on her claim that she was terminated in response to protected activity.  *See, e.g.*, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

Moreover, Risco cannot establish a *prima facie* retaliation case for the additional reason that the ultimate decisionmaker was unaware of her participation in prior protected activity.  Rogers, the ACES director who made the decision to terminate Risco from the internship program after speaking

21

with Risco, Byrd, and Risco's coworkers, testified that she was unaware of Risco's EEO activity. FFC Tr. 922:16-923:4.  There is no evidence in the record to dispute Rogers's statement that she was unaware that Risco had filed a discrimination or retaliation complaint with the EEO office, or had otherwise alleged Byrd discriminated or retaliated against her, prior to her decision to terminate Risco.  *See* FFC Tr. 943:21-946:11, 949:5-950:7.  Because Risco cannot establish a causal connection between her participation in protected activity and an adverse employment action, the Army is entitled to summary judgment on Risco's retaliation claim.

**H.**     **Alternatively, Risco Cannot Rebut the Army's Legitimate, Non-Discriminatory Reasons for Its Actions**

Risco's claims also fail under the third step of the *McDonnell Douglas* framework, because the record establishes that the Army's actions, including the decision to terminate Risco's employment, resulted from her increasingly erratic behavior.  To avoid summary judgment once an employer proffers a legitimate non-discriminatory reason for the adverse employment action, the employee must point to evidence sufficient to permit an inference that the employer's proffered non-discriminatory reason is pretextual and that discrimination or retaliation was a "substantial reason for the adverse employment action."  *Jute*, 420 F.3d at 173 (citations omitted); *see McDonnell Douglas Corp.*, 411 U.S. at 802; *Burdine*, 450 U.S. at 254.

The record contains ample well-documented evidence to support the Army's decision to terminate Risco's employment during the probationary period for legitimate, non-discriminatory reasons.  Risco exhibited odd behavior shortly after arriving at West Point, and Byrd's repeated attempts to counsel her had no discernible effect on her behavior.  Her coworkers universally reported that Risco's behavior created an uncomfortable work environment where they were reluctant to engage in open communication, and they catalogued various aspects of Risco's unusual behavior,

including pet names for co-workers (even after being asked to stop), references to slapping coworkers, accusations that her co-workers were gossiping about her, bizarre voicemails, and bypassing University field representatives to contact the University president directly.  The record establishes that Byrd decided to recommend Risco's termination in late March 2009, because her inappropriate behavior was escalating and all efforts to correct the behavior through counseling proved ineffective, and that Rogers made the decision to terminate Risco during the probationary period for failure to demonstrate fitness and qualification for continued employment.  *See* FFC Tr. 922:16-923:4.

For her part, Risco does not dispute that much of her bizarre behavior occurred as described; rather, she puts forward a myriad of excuses as to why her behavior was misunderstood.  But to avoid summary judgment, "the plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action . . . .  To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination."  *Tori v. Marist Coll.*, 344 Fed. Appx. 697, 699 (2d Cir. 2009) (citing *Weinstock*, 224 F.3d at 42).  Risco cannot meet this burden and, therefore, the Army is entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, the Court should grant the Army's motion for summary

judgment.

Dated: New York, New York
       December 13, 2011               PREET BHARARA
                                 United States Attorney for the
                                 Southern District of New York

                     By:    /s/ David Bober_____
                               DAVID BOBER
                               Assistant United States Attorney
                               United States Attorney's Office
                               86 Chambers Street, 3rd Floor
                               New York, NY 10007
                               (212) 637-2718
                               david.bober@usdoj.gov

OF COUNSEL:
Ms. Annette Perry
U.S. Army Litigation Division
9275 Gunston Road
Fort Belvoir, Virginia 22060
(703) 693-1036