UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————x

ANYA JUAN RISCO,                                    :
                                                    :
                              Plaintiff,            :
                                                    :
              - against -                           :          **OPINION AND ORDER**
                                                    :          10 Civ. 6314 (ER)
                                                    :
JOHN M. McHUGH, Secretary of the Army,              :
                                                    :
                              Defendant.            :

————————————————————————x

Appearances:

Michael H. Sussman
Sussman & Watkins
P.O. Box 1005
Goshen, NY 10924
*Attorney for Plaintiff*

Preet Bharara
United States Attorney for the
Southern District of New York
*Attorney for Defendant*

David Bober, *on the brief*
Assistant United States Attorney
for the Southern District of New York
*Attorney for Defendant*

Ramos, D.J.:

          Plaintiff, Anya Juan Risco, brought suit against Defendant, John M. McHugh, Secretary

of the Army ("Defendant" or the "Army"), under Title VII of the Civil Rights Act of 1964, 42

U.S.C.A. §§ 2000e-2000e-17, alleging that Defendant, acting by and through his agents,

discriminated against her on the basis of her race, color, disability and/or perceived disability,

and in retaliation for her initiation of protected activity, by subjecting Plaintiff to a hostile work

environment.[1] (Compl. ¶ 46). Plaintiff also alleges that Defendant discriminated against her by terminating her employment because of her race and color, her disability and/or perceived disability and in retaliation for engaging in protected activity. (*Id.* ¶ 47). Defendant now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) arguing that all of Plaintiff's claims against the Army should be dismissed. For the reasons stated herein, Defendant's motion is GRANTED in full.

## I. Background

The following facts are undisputed unless otherwise indicated.[2] Risco is a dark-skinned Hispanic woman who is currently fifty years old. (Def.'s Stmt. Undisputed Facts Pursuant to

---

[1] Plaintiff's pleadings do not clearly set forth whether she intends the term "hostile work environment" to represent an independent claim for relief under Title VII. The Complaint contains only two causes of action, which each appear to contain multiple claims. (Compl. ¶¶ 46-47.) The term "hostile work environment" appears in the first cause of action, which states:

> By subjecting plaintiff to a hostile work environment on account of her race and color, her disability and/or perceived disability and in retaliation for her initiation of protected activity, defendant, acting through and by his agents, created a hostile work environment and do [sic] discriminated against plaintiff in violation of Title VII of the Civil Rights Act of 1964.

(*Id.* ¶ 46.) Since the parties have addressed Plaintiff's reference to a "hostile work environment" as a separate claim in their summary judgment papers, and Plaintiff did not use the term "hostile work environment" in discussing her retaliation or discrimination claims, (Pl.'s Mem. Opp. Def.'s Mot. Summ. J. ("Pl.'s Mem.") 5-8, 11-12), the Court will also analyze Plaintiff's hostile work environment arguments as a separate claim.

[2] In answering a motion for summary judgment pursuant to Fed. R. Civ. P. 56, litigants in this District are required by our Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record. *See* Local Rule 56.1(b), (d); *see also* Fed. R. Civ. P. 56(c) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). My Individual Practices further require the party opposing a motion for summary judgment to reproduce each entry in the moving party's Rule 56.1 Statement and set out her response directly beneath it. *See* Individual Practices Rule 2(C)(i). These rules—simple to understand and apply—are designed to assist the Court by narrowing the scope of the issues to be adjudicated and identifying the facts relevant and admissible to that determination. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").

Unfortunately, Plaintiff's counsel in this case has once again failed to comply with these straightforward requirements. Plaintiff's Response to Defendant's Rule 56.1 Statement (the "Statement") is deficient in several

significant respects. (*See* Pl.'s Response Def.'s Rule 56.1 Stmt. ("Pl.'s 56.1 Response"), Doc. 21.) First, it frivolously purports to deny certain factual assertions that a review of the record establishes have previously been admitted by Plaintiff in sworn testimony, or otherwise relied on by Plaintiff. *See, e.g., infra* notes 9, 16 (discussing Pl.'s 56.1 Response ¶¶ 9, 21). Indeed, in one response, counsel both "admits" and "denies" the same asserted fact. (Pl.'s 56.1 Response ¶ 25.)

Second, the Statement fails to comply with Fed. R. Civ. P. 56(c) and Local Rule 56.1 in that it fails to support many of Plaintiff's purported denials with any citations to admissible evidence or with citations to evidence that actually support her contentions. *See, e.g., infra* notes 8, 9, 16, 17, 30 (discussing Pl.'s 56.1 Response ¶¶ 9, 21, 25); *see also Holtz*, 258 F.3d at 74 (explaining that where, as here, there are no citations to admissible evidence, or the cited materials do not support the purported undisputed facts in a party's Rule 56.1 statement, those assertions must be disregarded); *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding plaintiff's responses to defendant's Rule 56.1 statement where plaintiff failed to refer to evidence in the record). "Allowing a Local Rule 56.1 statement to substitute for the admissibility requirement set forth in Fed. R. Civ. P. 56(e) 'would be tantamount to the tail wagging the dog,'" and "would risk creating tension between Local Rule 56.1 and Fed. R. Civ. P. 56." *Holtz*, 258 F.3d at 74, 74 n.1 (quoting *Rivera v. Nat'l R.R. Passenger Corp.*, 152 F.R.D. 479, 484 (S.D.N.Y. 1993)).

Third, the Statement improperly interjects arguments and/or immaterial facts in response to facts asserted by Defendant, without specifically controverting those facts. *See, e.g., infra* notes 9, 10, 12, 14, 16, 17, 23, 25, 30 (discussing Pl.'s 56.1 Response ¶¶ 8, 9, 10, 13-15, 21, 25); *Costello*, 783 F. Supp. 2d at 661 n.5 (disregarding plaintiff's responses to defendant's Rule 56.1 Statement where plaintiff responded with conclusory assertions or legal arguments). In other instances, counsel neither admits nor denies a particular fact, but instead responds with equivocal statements such as: "Admit that the email so stated but deny as incomplete" (Pl.'s 56.1 Response ¶ 10), "Admit, but incomplete" (*id.* ¶ 20), or "Deny as to the claims." (*Id.* ¶ 21.) "Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 458 n.1 (S.D.N.Y. 2011); *see also Costello*, 783 F. Supp. 2d at 661 n.5 (disregarding plaintiff's responses where plaintiff failed to specifically dispute defendant's statements); *Buckman v. Calyon Secs.*, 817 F. Supp. 2d 322, 328 n.42 (S.D.N.Y. 2011) ("56.1 statements not explicitly denied by plaintiff are deemed admitted"); *Geoghan v. Long Island R.R.*, No. 06 CV 1435 (CLP), 2009 WL 982451, at *5-6 (E.D.N.Y. Apr. 9, 2009) ("Since plaintiff's response does not dispute the accuracy of the assertion, the assertion is deemed to be admitted by plaintiff for purposes of this motion.")

Fourth, the Statement improperly asserts new allegations or arguments not otherwise made. *See, e.g., infra* note 16 (discussing Pl.'s 56.1 Response ¶ 21). Fifth, though admittedly less important, the Statement fails to conform to my Individual Practices which require litigants to reproduce each entry in the moving party's Rule 56.1 Statement and set out the opposing party's response directly beneath it. Individual Practices Rule 2(C)(i). This requirement is also contained in the individual rules of other judges in this District and in this courthouse before whom Plaintiff's counsel frequently appears.

The balance of counsel's submissions in no way serve to cure the deficiencies in Plaintiff's 56.1 Statement and, indeed, Plaintiff's other submissions simply serve to add to the Court's burden. For example, Plaintiff's Affidavit is replete with improper averments, including statements not based on personal knowledge and assertions that are explicitly contradicted by admissible evidence in the record (including Plaintiff's prior sworn testimony) and Plaintiff's other submissions. *See, e.g., infra* notes 7, 16, 52 (discussing Pl.'s Aff. Opp. Def.'s Mot. Summ. J. ("Pl.'s Aff.") ¶¶ 4, 13, 24, 29-30); *see also Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 131 n.12 (2d Cir. 2004) (noting that district court was free to disregard hearsay statements and speculation in affidavits); *Flaherty v. Filardi*, No. 03 Civ. 2167(LTS)(HBP), 2007 WL 163112, *4-5 (S.D.N.Y. Jan. 24, 2007) (disregarding inadmissible portions

of plaintiff's affidavit in analyzing motion for summary judgment); *Morris v. Northrop Grumman Corp.,* 37 F. Supp. 2d 556, 568-69 (E.D.N.Y. 1999) (same); *Rojas v. Roman Catholic Diocese of Rochester*, 783 F. Supp. 2d 381, 406-07 (W.D.N.Y. 2010) (plaintiff's affidavit that disputes her own prior sworn testimony must be disregarded), *aff'd*, 660 F.3d 98 (2d Cir. 2011), *cert. denied*, 132 S. Ct. 1744 (2012); *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (same) (citing *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468-71 (S.D.N.Y. 1998) (Sotomayor, J.), *aff'd*, 205 F.3d 1324 (2d Cir. 2000)).

Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, while loaded with factual arguments which could conceivably have raised a genuine issue of material fact, *does not contain one single citation to the record*, and, in certain instances, Plaintiff's factual assertions are expressly contradicted by admissible evidence in the record. *See, e.g., infra* notes 50, 52 (discussing Pl.'s Mem. 7, 10-11). By way of further example, counsel devotes approximately one and one-half pages of Plaintiff's Memorandum to defending a purported Americans with Disabilities Act ("ADA") claim. (Pl.'s Mem. 8-9). There are two problems with this argument, one factual the other legal. The factual problem is that there is *no* ADA claim in the Complaint. Plaintiff arguably raises two causes of action in her Complaint, both sounding in Title VII violations. (Compl. ¶¶ 46-47). The legal problem with Plaintiff's "ADA claim," had it actually been asserted, is that there can be no ADA claim against the federal government. *See infra* Section V. (Defendant's papers fared no better in this regard, it devoted three-and-one-half pages to opposing a non-existent Rehabilitation Act claim. (Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") 15-17; Reply Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Reply Mem.") 4-5.)) Plaintiff's Memorandum also contains references to discrimination and hostile work environment claims on the basis of age, national origin and gender. (*See, e.g.*, Pl.'s Mem. at 5, 8, 10.) These also are not among the claims that Plaintiff has asserted in the instant case. As these references appear to be mistakes, the Court has disregarded all references to age, gender and national origin.

In addition, unlike the usual attorney affirmations which merely attach copies of documents alleged to be relevant and admissible, and identifies those documents for the Court, Plaintiff's counsel submitted an affirmation which includes arguments and factual assertions. (Aff. of Michael H. Sussman, Esq. ("Sussman Aff."), Doc. 22.) The affirmation is patently improper in that he could not possibly have personal knowledge of the matters discussed, as evidenced by the fact that the affirmation—unlike counsel's other submissions—actually contains citations to the record (*see, e.g.*, Sussman Aff. ¶¶ 2-7), and because counsel attaches documents that contain inadmissible hearsay or that are inadmissible by virtue of the fact that they are nowhere properly identified, much less authenticated. (*See, e.g.*, Sussman Aff. Exs. 6-8, 12, 14); *see also* Fed. R. Civ. P. 56(c)(4) (an affidavit or declaration used to oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated). In resolving this motion, the Court has relied only on the exhibits to the affirmation that contain admissible evidence, and has not considered the improper assertions and arguments contained in the affirmation, or the exhibits to the affirmation containing inadmissible evidence. *Wyler v. United States*, 725 F.2d 156, 160 (2d Cir. 1983) ("An affidavit of the opposing party's attorney which does not contain specific facts or is not based on first-hand knowledge is not entitled to any weight."); *see also Little v. City of New York*, 487 F.Supp.2d 426, 433 n. 2 (S.D.N.Y. 2007) ("The law is clear that an attorney's affirmation that is not based on personal knowledge of the relevant facts is to be accorded no weight on a motion for summary judgment.").

Although the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the Court's attention, *Holtz*, 258 F.3d at 73, the net result of counsel's deficiencies has been to impose on the Court and its limited resources the burden of parsing the entirety of the voluminous record in the instant case to ensure that his client's claims receive thorough and just consideration. (The Court also notes that Defendant failed to raise *any* of these deficiencies in responding to Plaintiff's Memorandum, and thus placed the onus of this arduous undertaking entirely on the Court.) In this regard, the Court notes that in

4

Local R. 56.1 ("Def.'s 56.1 Stmt.") ¶ 1.[3])  Prior to her employment with the Army, Risco served

in the United States Navy for over twenty years, and was honorably discharged in 2001.  (Bober

---

several instances, in the interests of justice, recourse was made to facts contained in the admissible evidence submitted by Defendant because Plaintiff had failed to submit, or even to make reference to, evidence favorable to her.  *See, e.g., infra* notes 16, 39, 43; *see also infra* notes 35, 51.

       In sum, for the reasons set forth above, and explained further below where necessary, in analyzing the instant motion, the Court has disregarded:  (1) averments in Plaintiff's 56.1 Statement that are not denials of the specifics facts asserted by Defendant, or not supported by citations to admissible evidence in the record, or that are contradicted by other admissible evidence in the record, or that are improper legal arguments; (2) improper assertions and arguments contained in Plaintiff's counsel's affirmation that are clearly not based on personal knowledge; (3) inadmissible evidence attached as exhibits to Plaintiff's counsel's affirmation; and (4) the improper portions of Plaintiff's Affidavit.

       As noted, this is not the first time a member of this Court has had to take the extraordinary step of admonishing Plaintiff's counsel concerning his obligations to follow the Local and Individual Rules of this Court. The admonitions date back as far as five years and as recently as two months.  *See, e.g., Tomlins v. Village of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 361 n.2 (S.D.N.Y. 2011) (admonishing Plaintiff's counsel for repeated failure to follow Individual Practices and declining to consider averments in plaintiff's 56.1 statement that were not supported by, or that were contradicted by, admissible evidence, or that were "legal arguments under the guise of undisputed facts"); *Vero v. Pepsi Cola of the Hudson Valley*, 10-CV-4112, 1 n.1 (Apr. 3, 2012) (same); *McGuire v. Warren*, No. 05 Civ. 02632 (DCP) (WCC), 2009 WL 3963941, at *2 n.5, *5 n.7, *11 n.9 (S.D.N.Y. Nov. 18, 2009) (same); *Woods v. Newburgh Enlarged City Sch. Dist.*, 473 F. Supp. 2d 498, 504 n.3 (S.D.N.Y. 2007) (admonishing Plaintiff's counsel for, *inter alia*, failing to cite to the record in his Memorandum and including material allegations not otherwise asserted or supported), *aff'd*, 288 Fed. App'x 757, 760 (2d Cir. 2008); *see also Rockland Vending Corp. v. Creen*, No. 07-CV-6268 (KMK), 2009 WL 2407658, at *9 n.14, *16 (S.D.N.Y. Aug. 4, 2009) (noting that Plaintiff's counsel merely restated assertions from complaint in opposing summary judgment motion "without adding any dates, other specifics, or citations to the record," and rejecting arguments based on inadmissible hearsay); *Newsom-Lang v. Warren Int'l, Inc.*, 249 F. Supp. 292, 294 nn.2, 3 (S.D.N.Y. 2003) (disregarding plaintiff's responses that purported generally to deny defendant's factual proffer where plaintiff did not deny any of the specific facts in defendant's proffer, and instead focused on immaterial facts tangentially related to defendant's statement), *aff'd*, 80 Fed. App'x 124 (2d Cir. 2003); *Copeland v. Sears, Roebuck & Co.*, 25 F. Supp. 2d 412, 417 n.1 (S.D.N.Y. 1998) (disregarding denials in plaintiff's 56.1 statement that were not supported by citations to admissible evidence).

       It simply will not do for counsel to say that genuine issues of material fact exist and then rely on the Court to go find them.  Much more is expected from an experienced member of the bar of this Court and will henceforth be strictly required.

[3] Pursuant to Local Rule 56.1(c), each factual statement set forth in Defendant's Rule 56.1 statement "will be deemed to be admitted for purposes of this motion unless specifically controverted by a correspondingly numbered paragraph" in Plaintiff's Response to the Rule 56.1 Statement.  *See supra* note 2.  Where possible, the Court has relied on the undisputed facts in Defendant's 56.1 Statement; however, direct citations to the record have also been used where relevant facts were not included in either of the parties' Rule 56.1 submissions.

Decl. Ex. B (Risco Dep. 11:22-13:16).[4])   Risco completed her bachelor's degree in 2004, and held various part time jobs from 2005 through 2008.  (*Id.* 14:7-15:5.)

### A.  Risco's Employment

Risco began her employment with the Army on September 28, 2008, as a probationary Guidance Counselor Intern in the U.S. Army Civilian Training Education Development System ("ACTEDS") at the United States Military Academy, West Point, New York.[5]  (Def.'s 56.1 Stmt. ¶ 2.)  As a probationary guidance counselor intern, Risco assisted military personnel who were interested in pursuing educational opportunities that were available to them through the Army.  (*Id.* ¶ 3.)  Risco's permanent appointment was subject to the satisfactory completion of a one-year probationary period.  (*Id.* ¶ 5.)  The purpose of the probationary period was to determine Risco's fitness for a permanent guidance counselor position.  (*Id.* ¶ 5.)  Federal regulations provide that the employer "shall terminate [an employee's] services during this period if [she] fails to demonstrate fully [her] qualifications for continued employment."  5 C.F.R. § 315.803.  Termination can be based on unsatisfactory performance or conduct.  5 C.F.R. § 315.804.

Risco's immediate supervisor at West Point was David Byrd, Director of the Education Center.  (Def.'s 56.1 Stmt. ¶ 4.)  Byrd was also the individual who selected Risco for the intern position in September 2008 from a list of candidates provided to him by ACTEDS.  (FFC Tr.

---

[4] "Bober Decl." refers to the December 13, 2011 Declaration of David Bober in support of Defendant's Motion for Summary Judgment.  (Doc. 15.)  Citations to "Risco Dep." refer to the transcript of the August 31, 2011 deposition of Risco.  (Bober Decl. Ex. B.)  Citations to "FFC Tr." refer to the transcript of the fact finding conference conducted to investigate Plaintiff's complaint of discrimination at the Army's Equal Employment Opportunity Office in West Point, New York, on September 10 and 25, 2009.  (Bober Decl. Ex. C.)  Plaintiff's attorney chose to rely on testimony from this administrative proceeding in lieu of conducting depositions in the instant case.  (Def.'s Mem. 4 n.1.)  Short excerpts from the transcripts of Plaintiff's deposition and the FFC hearing were also submitted as part of Plaintiff's evidence.  (Sussman Aff. Exs. 1, 2.)

[5] ACTEDS is an Army civilian training program which recruits and selects candidates for the guidance counselor career program that Risco participated in as an intern at West Point. (Def.'s Mem. 4 n.1.)

29:22-30:18; Risco Dep. 17:10-23.)  Byrd's immediate supervisor was Michael Bilello, Director

of Human Resources.  (FFC Tr. 272:5.)  Byrd and Bilello are both white males.  (Def.'s 56.1

Stmt. ¶ 4.)  As a probationary guidance counselor intern, Risco was also supervised by a number

of individuals in the Installation Management Command ("IMCOM") and Army Continuing

Education ("ACES")/ACTEDS chain of command.[6]

Defendant argues that Risco began to exhibit erratic behavior shortly after she was hired,

and that her inappropriate behavior escalated over time, notwithstanding her supervisor's efforts

to correct the behavior through informal counseling.[7]  (Def.'s Mem. 2, 5-8, 23; Def.'s Reply

Mem. 1-3.)  Plaintiff claims that neither of her supervisors raised any serious issues concerning

her performance or conduct from September 28, 2008 through March 8, 2009.  (Compl. ¶ 14;

Pl.'s Aff. ¶ 11.)

On July 10, 2009, after approximately nine months of employment, Risco was told she

was being terminated from the internship program by Ileen Rogers, the director of ACES.

(Def.'s 56.1 Stmt. ¶ 26.)  The stated basis of the termination was Risco's "fail[ure] to exhibit the

requisite behavior to perform successfully as a guidance counselor."  (Bober Decl. Ex. O, at 1.)

The termination was effective on July 25, 2009.  (*Id.*)  Of the numerous individuals involved in

the decision to terminate Risco's probationary employment, Risco imputes improper motives to

only two people:  Byrd and Bilello.  (Compl. ¶ 38; Risco Dep. 79:5-8.)

---

[6] The relationship between IMCOM and ACES/ACTEDS is not explained in the record.

[7] Although Risco now avers that she did not receive any written or verbal counseling prior to March 8, 2009 (Pl.'s Aff. ¶ 13), she previously testified about verbal counseling that she received from Byrd in relation to various incidents in late 2008 and again in March 2009.  (*See, e.g.*, FFC Tr. 129:12-130:1, 144:6-7, 148:2-3.)  *See supra* note 2.  Further, as a probationary employee, Risco was not subject to the same disciplinary procedures as permanent employees, and written counseling was not required.  (FFC Tr. 852:6-853:22.)  *See also Sampson v. Murray*, 415 U.S. 61, 63-64 (1974) (explaining that applicable federal regulations provide that probationary employees can be terminated without being afforded the greater procedural protections that are given to permanent employees).

**B.  Risco's Behavior**

Defendant has identified various instances of Risco's behavior that her supervisors and co-workers deemed inappropriate, unusual, or disruptive to the workplace, which formed the basis for Risco's termination.  (Def.'s Mem. 5-8; Def.'s Reply Mem. 2-4.)  Plaintiff does not dispute the occurrence of the incidents recounted below.

The first conduct-related incident occurred in late 2008 or early 2009.  On that occasion, after learning that Risco was scheduled to accompany Byrd on a work trip to Hawaii, Victoria McPeak, one of Risco's co-workers, is alleged to have said to Byrd: "Well, what does your wife think of you taking [Risco] to Hawaii?"[8]  (FFC Tr. 143:17-19.)  Risco was offended by McPeak's comment and subsequently told Byrd: "where I come from, she [McPeak] would be disciplined by her mother, father, brother, sister, she would be slapped by her mother, brother, father, sister."  (Def.'s 56.1 Stmt. ¶ 9;[9] Risco Dep. 96:14-19; FFC Tr. 144:1-9.)  Byrd immediately counseled Risco in person about this statement.  (Def.'s 56.1 Stmt. ¶ 9; FFC Tr. 144:6-7, 148:2-3.)  Byrd also counseled McPeak about the incident.  (FFC Tr. 280:10-19.) McPeak did not recall making the comment but assured Byrd that it wouldn't happen again.  (*Id.* 280:15-22.)  Risco continued to refer to this incident repeatedly over the next four to five months, despite directions from both Byrd and Bilello to "drop it."  (*Id.* 282:16-283:13.)

---

[8] Although Risco claims that McPeak made this comment to Byrd, Plaintiff has not cited admissible evidence to support her assertion. (Pl's 56.1 Response ¶ 9 (citing testimony of Bilello who repeatedly stated that he did not witness the incident (FFC Tr. 628:9-12, 711:19-22)); *see supra* note 2.  Byrd testified that he did not remember McPeak making any comment about Risco going to Hawaii, but that he "took [Risco] at her word that she was offended by a statement."  (FFC Tr. 280:11-15, 281:11-18.)

[9] Plaintiff's Response purports to deny paragraph 9 of Defendant's 56.1 Statement, which directly and accurately quotes *her* deposition as the source of the statement, but then alleges that the statement was willfully taken out of context and misrepresented by Byrd.  (Pl.'s 56.1 Response ¶ 9.)  Thus, Plaintiff's Response does not specifically controvert the fact set forth in Defendant's Statement, which is deemed admitted for purposes of this motion.  *See supra* note 2.  Additionally, Risco's assertion that her comment "did not lead to counseling from her supervisors" is not supported by any citations to the record (Pl.'s 56.1 Response ¶ 9), and is contradicted by Risco's sworn testimony.  (*See, e.g.*, FFC Tr. 144:6-7, 148:2-3.)

During the first five months of her employment, Risco was also in the habit of referring to her co-workers and superiors by pet names such as "Aunties," "Papa" and "Don." (Def.'s 56.1 Stmt. ¶ 8.[10]) Although the parties disagree as to the frequency and duration of this practice (Pl.'s 56.1 Response ¶ 8), it is undisputed that Risco did use these nicknames, and that both Byrd and Bilello had to ask Risco to stop referring to them by pet names. (FFC Tr. 244:1-18, 245:5-246:19; 438:20-441:3.) Risco states that she stopped using the pet names as soon as she was asked to do so. (Pl.'s 56.1 Response ¶ 8.)

On March 8, 2009, Risco sent Byrd an email stating that she was feeling "overwhelmed" by her work assignments, and that her health issues were distracting her from work and affecting her productivity level.[11] (Def.'s 56.1 Stmt. ¶ 10.[12]) Risco also expressed her belief that she was being assigned duties that were beyond the scope of her job as a guidance counselor intern. (Bober Decl. Ex. D; Pl.'s 56.1 Response ¶ 10.) In response, Byrd explained that he was giving her duties beyond the narrow scope of her position in an effort to expose Risco to the broad range of tasks that she would encounter as a permanent guidance counselor, and to ensure that he was providing her with the "proper education, training and tools to accomplish the robust mission that ACES is charged with." (Bober Decl. Ex. D, at 2.) He also explained that he was sincerely trying to help her and wanted her to succeed. (Def.'s 56.1 Stmt. ¶ 11.) In addition,

[10] Plaintiff's Response purports to deny paragraph 8 of Defendant's 56.1 Statement "as incomplete and irrelevant" (Pl.'s 56.1 Response ¶ 8), but Plaintiff does not specifically controvert the fact set forth in Defendant's 56.1 Statement. *See supra* note 2.

[11] The record reflects that Risco suffers from tri-compartmental osteoarthritis in her knees, and a history of hypertension, hyper-lipidemia and coronary artery disease. (Pl.'s Aff. ¶ 10.)

[12] Plaintiff's Response to Defendant's 56.1 Statement regarding this email ("[a]dmit that the email so stated but deny as incomplete") does not specifically controvert the facts that Defendant claims are undisputed. (Pl.'s 56.1 Response ¶ 10.) *See supra* note 2.

Byrd noted that Risco's workload was only a fraction of that of other Education Center personnel.  (*Id.*)

On March 22, 2009, Risco sent an email to her supervisors and co-workers with the subject line "Proffessionalism [sic] and Etiquette in the Workplace," stating that she "observed many departments . . . diminish their professionalism, productivity and positive work environment due to malicious gossip," and that she hoped her co-workers were "far too superior and professional to engage in gossip."  (Def.'s 56.1 Stmt. ¶ 12; Bober Decl. Ex. E.)  Byrd verbally counseled Risco about sending this email, which he believed was inappropriate and accusatory in nature.[13]  (FFC Tr. 314:5-316:3.)  Several of Risco's co-workers also reported to Byrd that they found Risco's email to be accusatory and harmful to the work environment. (Def.'s 56.1 Stmt. ¶ 13;[14] Bober Decl. Ex. F, at 2-4; *see also* FFC Tr. 774:3-775:8.)  Byrd and Bilello were unable to determine what motivated Risco to send the email (FFC Tr. 314:10-316:3, 661:1-662:3), and Risco claims that she was not accusing her co-workers or supervisors of engaging in gossip.[15]  (FFC Tr. 248:13-15, 249:5- 250:21.)

In March of 2009, Risco also left several voicemail messages for Byrd and Bilello which they considered unusual.  (FFC Tr. 430:3-7, 431:8-11, 433:6-8, 434:4-435:1, 662:10-665:2.)  In one such message, Risco expressed concerns that her co-workers were misinterpreting her

---

[13] Risco provided different descriptions of her conversation with Byrd on each of the two occasions on which she gave sworn testimony.  (*Compare* FFC Tr. 129:12-130:5 (testifying that Byrd told her the email was accusatory and negative) *with* Risco Dep. 112:6-15, 113:13-22 (testifying that Byrd responded to the email by telling her that she was either making trouble or that she was a troublemaker).)

[14] Plaintiff's Response purports to dispute the characterization of the facts set forth in Defendant's 56.1 Statement, but does not specifically controvert Defendant's Statement.  (Pl.'s 56.1 Response ¶ 13.)  *See supra* note 2.

[15] The Court notes that the EEO Counselor's Report documenting Risco's informal complaint of discrimination includes allegations that Risco made about "malicious gossip being spread about [her] in the office."  (Sussman Aff. Ex. 13, at 6.)  A written statement prepared by Nancy Judd, a permanent guidance counselor in the Education Center, also states that, in a later conversation, Risco said that "contract employees had been 'gossiping' . . . and implied that the gossip concerned her."  (Bober Decl. Ex. F, at 3.)

platonic relationship with a local business owner, and made a comment about all New Yorkers being ignorant.[16]  (FFC Tr. 432:3-432:17, 662:10-663:1, 664:1-11.)  Both Byrd and Bilello described the message as unusual in nature, and neither supervisor understood the impetus behind the messages, if any.[17]  (FFC Tr. 434:21-22, 435:20-437:8, 663:10:665:2.)  Risco's belief that others were commenting on her relationship with the business owner was also reported by one of her co-workers, who similarly found Risco's seemingly unfounded concerns to be unusual.  (Bober Decl. Ex. F, at 3-4.)

On March 24, 2009, without explanation, Risco sent Byrd and Bilello an email informing them that she was "submitting her two-week resignation letter."  (Def.'s 56.1 Stmt. ¶ 16; Bober

---

[16] Although Plaintiff avers that "the only messages [she] left related to specific complaints of discrimination" (Pl.'s Aff. ¶ 4), this claim is contradicted by Plaintiff's assertion that Byrd used the voicemail message described above, and referenced in Defendant's 56.1 Statement, as "evidence of plaintiff's allegedly erratic behavior."  (Pl.'s 56.1 Response ¶ 21.)  Plaintiff's 56.1 Response also includes an assertion that her voicemail messages should have been treated as protected activity.  (Id.)  At the outset, this allegation is improperly presented for the first time in Plaintiff's 56.1 Response Statement.  See supra note 2.  Moreover, Plaintiff has not submitted any evidence of voicemail messages containing complaints of discrimination, nor identified any adverse actions that Risco claims to have suffered in retaliation for leaving these messages.  Notwithstanding these deficiencies, the Court has considered the assertion in the interest of deciding this motion on the merits.  Based on examination of the entire record, including evidence submitted by Defendant, it appears that Plaintiff's claim relates to voicemail messages that Risco left for Bilello in late June 2009, as distinguished from the March 2009 voicemails referenced in Defendant's 56.1 Statement, wherein she complains that Byrd is ignoring her and asserts that his behavior amounts to racial discrimination.  (See FFC Tr. 670:2-672:4, 674:7-675:14, 677:6-16.)  Contrary to Risco's claim that Bilello "never attempted to independently verify her claims" (Pl.'s 56.1 Response ¶ 21), the evidence that Plaintiff cites demonstrates that Bilello discussed the concerns contained in the late June voicemails with both Risco and Byrd.  (FFC Tr. 707:11-707:21.)  Based on those conversations, Bilello determined that any actions taken by Byrd had been for legitimate, nondiscriminatory reasons (id. 685:9-22, 707:1-4), and that Risco was not complaining of any type of discrimination prohibited by Title VII.  (Id. 686:5-687:15, 708:12-17.)

[17] Plaintiff's assertion that "Bilello did not consider the voicemails to show anything 'erratic' . . . [n]or did he believe their content unusual" (Pl.'s 56.1 Response ¶ 21), is not supported by the testimony that Plaintiff cites.  Moreover, this assertion is not properly included as a response to Defendant's Statement, which is a general reference to the incidents that Byrd described in his memo to Colonel Daniel V. Bruno, West Point Garrison Commander.  (Def.'s 56.1 Stmt. ¶ 21.)  See supra note 2.

Decl. Ex. G.)  Three days later Risco sent an email to Byrd and Bilello rescinding her

resignation, again without explanation.  (Def.'s 56.1 Stmt. ¶ 18; Bober Decl. Ex. I.)

On April 24, 2009, Risco sent Bilello an email to request Army regulations regarding

monitoring civilian personnel email accounts, explaining that she believed that Byrd was

accessing her email account.  (Def.'s 56.1 Stmt. ¶ 19; Bober Decl. Ex. J.)  In the email, Risco

alleged that Byrd had told her on several occasions that he was capable of reading Risco's email

messages, and she claimed that Byrd had repeated some of her email messages to her verbatim.

(Bober Decl. Ex. J.)  Byrd testified that those conversations never occurred.  (FFC Tr. 505:8-

506:10.)

### C.  Risco's Initial Contact with the Army EEO Office in March 2009

In March 2009, Risco contacted the Army Equal Employment Opportunity ("EEO")

office for the purpose of obtaining information about the rules relating to disabled employees

working for the government (Def.'s 56.1 Stmt. ¶¶ 27-28), and because she wanted someone to

speak to Byrd about her training, their communication issues, and Byrd's unprofessional

conduct.[18]  (FFC Tr. 33:13-34:7, 54:2-55:4; Risco Dep. 45:13-18, 46:17-19.)  Risco met with

Linda Burnett, an EEO representative, at the EEO building at West Point.  (Risco Dep. 43:2-8,

48:11-49:14.)  Risco has admitted that when she first contacted the Army EEO office, she did not

---

[18] At the fact finding conference, Risco testified that she went to the Army EEO office to complain about her training, Byrd's practice of asking other employees if they liked her, and because Byrd had misunderstood two emails that she sent in March.  (FFC Tr. 33:19-34:7, 54:3-55:8.)  At her deposition, Risco testified that she contacted the Army EEO office to get information about regulations for disabled workers (Risco Dep. 35:9-23, 40:23-41:3, 47:19-21, 48:12-16), and because of "concerns of unprofessionalism by [her] supervisor, Mr. Byrd."  (*Id.* 42:11-14, 44:17-19, 45:14-15.)  When asked to identify Byrd's "unprofessional" conduct, Risco alleged that he had made disparaging comments about people with disabilities (*id.* 46:5-19, 48:12-14); however, she could not recall any disparaging remarks that Byrd made prior to her initial EEO visit (*id.* 46:9-47:13), and she said that she did not have any complaints about how Byrd treated her prior to her initial EEO visit (*see, e.g.*, *id.* 40:6-9, 41:9-23, 44:25-46:18), except that Byrd was "standoffish" when Risco approached him about her need to take leave to attend medical appointments.  (*Id.* 36:3-6, 41:3-7.)

believe that she was being discriminated against.  (Def.'s 56.1 Stmt. ¶ 29; Risco Dep. 38:25-39:4, 40:6-9, 45:9-18, 47:22-48:19.)

During this time period, Burnett had a separate meeting with Byrd to address the unprofessional behavior about which Risco had complained.[19]  (FFC Tr. 427:11-12.)  Byrd described the meeting as a "mediation" intended to improve Byrd's future interactions with Risco.  (*Id.* 428:12-14.)  During the meeting, Byrd told Burnett about Risco's increasingly erratic behavior, including the unusual voicemail messages described above.  (*Id.* 429:17-430:7, 432:6-10, 434:4-17.)

On March 24, 2009, Risco forwarded her resignation email to Burnett with the message: "I finally decided to follow my conscious [sic] and resign!"  (Def.'s 56.1 Stmt. ¶ 17; Bober Decl. Ex. H.)  On March 27, 2009, Risco sent another email to Burnett to inform her about a comment that she claims Byrd made on March 24, 2009.[20]  (Sussman Aff. Ex. 5.)  Risco claimed that Byrd made a remark about Risco's inability to perform certain duties because of her "health issues," and then said: "It's probably mental."[21]  (Pl.'s Aff. ¶ 21; FFC Tr. 58:10-59:6).  In the email to Burnett, Risco describes Byrd's comment as an insult and expresses a desire to speak to Byrd and an EEO representative about it.  (Sussman Aff. Ex. 5.)  Plaintiff avers that she "began to develop for filing [sic] an informal complaint of discrimination on the basis of perceived disability" at this time.[22]  (Pl.'s Aff. ¶ 22.)

---

[19] Byrd could not recall the date of his meeting with Burnett and there is no written documentation of the meeting in the record, but Byrd testified that the meeting occurred before the decision to terminate Risco was made.  (FFC Tr. 427:10-15, 458:4-460:4.)

[20] Although Plaintiff's Affidavit states that this incident occurred on March 27, 2009 (Pl.'s Aff. ¶ 21), the email itself—which was submitted as part of Plaintiff's evidence—alleges that this occurred on March 24, 2009. (Sussman Aff. Ex. 5.)

[21] Byrd denies making the statement.  (FFC Tr. 538:7-11.)

[22] *See infra* note 28.

**D. Personnel Actions and Risco's Termination**

By March 2009, Byrd had become sufficiently concerned about Risco's behavior to raise the issue with his director supervisor, Bilello, as well as Risco's supervisors in the ACES/ACTEDS reporting chain.  Specifically, he spoke with Anthony Clark, the IMCOM Intern Coordinator, and Renee Mongo-Jenkins, an ACES Education Services Specialist who was responsible for the intern training program.  (FFC Tr. 316:5-16.)  In addition, in late March or early April, Byrd and Bilello met with William Riddle, a labor-management employee relations specialist at the Civilian Personnel Advisory Center.  (*Id.* 457:13-19, 865:8-10.)  After hearing Byrd's concerns, Riddle, Clark, Mongo-Jenkins and David Rood (IMCOM Northeast Education Chief) all directed Byrd to collect statements from any of Risco's co-workers who had directly witnessed the conduct at issue.  (*Id.* 288:18-289:3, 317:9-19, 466:13-473:22, 637:8-11.)

Pursuant to these instructions, in late April and early May, Byrd collected written statements from Risco's co-workers in the Education Center.  (*Id.* 317:3-19, 467:4-468:5; Bober Decl. Ex. F.)  The statements include descriptions of the incidents summarized above, as well as other examples of Risco's conduct that they considered unusual and inappropriate, and which they believed had negatively affected their working environment.  (Def.'s 56.1 ¶¶ 14-15;[23] Bober Decl. Ex. F.)

Based on the reports of the conduct described above, IMCOM initially decided to terminate Risco's probationary employment in late April or early May 2009.  (Compl. ¶ 32; FFC Tr. 850:6-8, 854:17-855:9.)  On May 1, 2009, Byrd sent a memo to the West Point Garrison Commander, Colonel Daniel V. Bruno recommending Risco's termination on the basis of the

---

[23] Risco denies that some of the additional incidents occurred, and disputes her co-workers' characterization of other incidents; however Plaintiff's Reponses do not specifically controvert Defendant's 56.1 Statement.  (Pl.'s 56.1 Response ¶¶ 13-15.)  The incidents that Risco denies have not been considered for purposes of this Motion.

same inappropriate behavior.[24]  (Def.'s 56.1 Stmt. ¶¶ 20-21;[25] Bober Decl. Ex. K.[26])  In his

memo, Byrd wrote that Risco "regularly exhibits inappropriate behavior and comments," "seems

unable to demonstrate empathy, remain non-judgmental, and remain objective in a diverse range

of circumstances," and is hindered in her ability to be a counselor by her "preconceptions [and]

stereotypes."  (Bober Decl. Ex. K, at 1.)  Byrd stated that Risco was unable to get along with her

co-workers, and that her confrontational and disruptive conduct "has had a definite negative

impact on [the] workforce and environment."  (*Id.* at 1-2.)  Byrd included several of the written

statements that had been collected from Risco's co-workers with the May 1 memo he sent to

Bruno.  (*Id.* at 7-10.)

On May 7, 2009, Risco sent Bilello a memo requesting a transfer from the Education

Center, and complaining that Byrd had subjected her to "discrimination," which she did not

otherwise define, and retaliation for "going up the Chain of Command."[27]  (Def.'s 56.1 ¶ 22;

Bober Decl. Ex. L.)  Bilello told Risco that she had to submit her transfer request to the

---

[24] The parties have failed to explain why Byrd sent the memo to Bruno to recommend Risco's termination after initiating the personnel action with Risco's IMCOM and ACES/ACTEDS supervisors.  As West Point Garrison Commander, Bruno was Byrd's ultimate supervisor, but Risco was not a West Point employee.  (FFC Tr. 856:12-15.)  There is contradictory evidence in the record about whether anyone at West Point had the authority to terminate Risco.  (*Compare id.* 343:11-344:6 (Byrd testifying that no one at West Point had the authority to approve Risco's termination) *with id.* 856:16-857:8 (Riddle testifying that both Bilello and IMCOM had the authority to terminate Risco's employment).)

[25] Plaintiff's Response to Paragraph 21 in Defendant's 56.1 Statement begins "Deny as to the claims," and cites to a paragraph in Risco's Affidavit in which she avers that ". . . none of the incidents cited in [ ] paragraph [21] ever happened."  (Pl.'s 56.1 Response ¶ 21 (citing Pl.'s Aff. ¶ 4).)  However, Plaintiff's 56.1 Response does not dispute the fact set forth in Defendant's 56.1 Statement.  *See supra* note 2.

[26] Plaintiff submitted only the first two pages of Byrd's memo, which contains his recommendation to discharge Risco.  (Sussman Aff. Ex. 3.)  Defendant's Exhibit K contains additional pages, which describe specific examples of conduct in support of Byrd's recommendation, including statements written by Risco's co-workers.  (Bober Decl. Ex. K, at 3-10.)  While some of the events described by Byrd are undisputed, the Court has not relied on the additional pages of Byrd's Memorandum in analyzing the instant motion.

[27] *See infra* note 51 for the complete text of the May 7 transfer request.

ACES/ACTEDS chain of command, because he didn't have the authority to transfer her.  (FFC Tr. 42:2-20, 116:11-117:12.)

On May 14, 2009, Risco was informed that IMCOM was not going to approve any more training or a transfer for her.  (Sussman Aff. Ex. 9.)  On the same day, Risco was placed on paid administrative leave pending a termination decision.  (Def.'s 56.1 Stmt. ¶ 23.)  Risco alleges that when she called Riddle to ask why she had been placed on administrative leave, she was told it was because of concerns about violence in the workplace, which she described as a "wholly baseless accusation."  (Pl.'s Aff. ¶ 32.)  The following day, on May 15, 2009, Risco contacted the Army EEO office to make an informal complaint of discrimination, in which she alleged that Byrd had been subjecting her to racial harassment since February 2009, and that she had been placed on administrative leave because of discrimination.  (Sussman Aff. Ex. 13; Def.'s 56.1 Stmt. ¶ 30.[28])

While Risco was on administrative leave, Byrd, Bilello and Riddle met with Wilfred Plumley, the Deputy Garrison Commander at West Point, to discuss Byrd's May 1 memo.  (FFC Tr. 403:5-404:8.)  Plumley informed them that Colonel Bruno wanted them to return Risco to work because she had never been provided with the specific performance objectives for her position.  (*Id.* 401:10-403:3, 618:1-5, 847:20-848:20.)  When IMCOM learned of Colonel Bruno's decision to return Risco to work at the end of May, it began the process of officially terminating her probationary employment.[29]  (*Id.* 848: 20-849:3, 856:8-11.)

---

[28] Although Defendant's 56.1 Statement indicates that Risco's informal complaint was made on the basis of "race/color and actual/perceived disability" (Def.'s 56.1 ¶ 30), this is not supported by the evidence to which Defendant cites.  (Bober Decl. Ex. P.)  The evidence in the record relating to Plaintiff's informal complaint indicates that she only complained of discrimination on the basis of race.  (Sussman Aff. Ex. 13; Bober Decl. Ex. P.)

[29] While IMCOM decided to end Risco's employment in late April or early May (Compl. ¶ 32; FFC Tr. 850:6-8), they did not begin the official termination process with ACES until after Colonel Bruno overruled Bilello's decision to discharge Risco.  (FFC Tr. 854:17-855:9, 856:2-11.)

Plumley also instructed Bilello to provide Risco with written counseling about their expectations for her performance and conduct when she returned to work. (Compl. ¶ 31; FCC Tr. 400:15-401:13, 620:7-13.) Accordingly, when Risco returned to work on May 29, 2009, Bilello provided her with a written counseling statement. (Def.'s 56.1 Stmt. ¶ 24; Bober Decl. Ex. M.) On June 5, 2009, Bilello provided Risco with a second counseling statement that had been prepared by Byrd, which documented the instances of inappropriate conduct that occurred prior to Risco's administrative leave. (Def.'s 56.1 Stmt. ¶ 26; Bober Decl. Ex. N; *see also* FFC Tr. 621:10-20, 625:13-19, 654:11-14). The June 5 counseling statement specifically referenced the prior threatening statements and Risco's failure to follow supervisory instructions.[30] (Def.'s 56.1 Stmt. ¶ 25; Bober Decl. Ex. N.) According to Plaintiff, the June 5 counseling memo "falsely recounted [her] conduct and took entirely out of context innocent remarks [she] had made to another employee." (Pl.'s Aff. ¶ 36.)

On June 26, 2009, Risco filed a Formal Complaint of Discrimination with EEO alleging that both Byrd and Bilello had subjected her to discrimination and harassment because of her race, color and an unspecified physical disability.[31] (Bober Decl. Ex. Q; Def.'s 56.1 Stmt. ¶ 31.[32]) As identified in the EEO Notice of Acceptance, Risco's formal complaint of

---

[30] Plaintiff's Response to this portion of Defendant's 56.1 Statement, which begins "Admit but incomplete/deny," does not contain any statements that specifically controvert the facts in Defendant's Statement. (Pl.'s 56.1 Response ¶ 25.) Moreover, Plaintiff does not cite to any evidence to support her assertions. (*Id.*) Accordingly, the Court will disregard these assertions. S*ee supra* note 2.

[31] Risco checked the box for discrimination on the basis of a physical disability in her Formal EEO Complaint (Bober Decl. Ex. Q, at 1), but did not include any information about a physical disability or any allegations of disability-based discrimination in the complaint. Additionally, Risco did not make any claims of discrimination on the basis of a *physical* disability in opposing the instant motion, and Risco has not stated a cognizable claim for discrimination on this basis. *See infra* Section V.

[32] Although Defendant's 56.1 Statement states that Risco's formal complaint also included a claim of discrimination based on a perceived mental disability (Def.'s 56.1 ¶ 31), this is not supported by the evidence to which Defendant cites. (Bober Decl. Ex. Q). Other evidence in the record indicates that Risco may have added a claim of

discrimination alleged discrimination and harassment on the basis of race, color and physical disability when, from the period beginning March 2009:  (1) Byrd alienated other employees from her by asking them to provide statements about her; (2) Byrd made offensive statements and remarks about her to her co-workers; (3) Byrd failed to give her proper guidance, direction or mentorship; (4) Byrd contacted the IMCOM Intern Coordinator to prejudice him against her, and (5) she was placed on paid administrative leave on May 14, 2009.  (Bober Decl. Ex. P, at 5.)

In addition, Risco claimed that she was subjected to retaliation for initiating the formal complaint, when:  (1) Bilello presented her with a written counseling statement (that had been prepared by Byrd) on June 5, 2009; (2) Byrd denied her request for training on June 16, 2009; and (3) from May 28, 2009 through the date of her formal complaint, Byrd refused to return her office keys.[33]  (Id.)  Risco's formal complaint accuses Byrd of "continued harassment," unequal treatment, "creating a hostile working environment" (Bober Decl. Ex. Q, at 1, 3), and other conduct that has not been included in Risco's instant complaint.  (Id. at 1-3, 6-8.)  Risco was notified that her complaint had been accepted for investigation by the EEO office on July 10, 2009.  (Bober Decl. Ex. P, at 5.)

Risco received a termination notice from Ileen Rogers on July 10, 2009.  (Def.'s 56.1 Stmt. ¶ 26.)  The notice stated that Risco was being discharged because she had failed to demonstrate the requisite fitness and qualification for continued employment as a guidance counselor.  (Def.'s 56.1 Stmt. ¶ 26; Bober Decl. Ex. O.)  Rogers' determination that Risco was not a suitable intern for the career program was based on Byrd's May 1 memo to Colonel Bruno,

---

discrimination on the basis of perceived mental disability in an amended EEO complaint (see, e.g., FFC Tr. 12:17-13:5; Bober Decl. Ex. R, at 1, 8, 24), but the amended complaint is not part of the record.  See infra note 35.

[33] Although Risco does not rely on Byrd's refusal to return her office keys as evidence of retaliation in the instant proceedings, the Court notes that Risco testified that she did not ask Byrd or Bilello to return her keys.  (FFC Tr. 254:19-255:8.)

the statements written by Risco's co-workers, and individual conversations with Byrd and

Risco.[34]  (FFC Tr. 909:6-910:20, 921:3-923:4, 954:8-19.)  The termination became effective on

July 25, 2009.  (Bober Decl. Ex. O.)

Risco supplemented her Formal Complaint of Discrimination apparently to add a claim of

retaliation after she received the termination notice on July 10, 2009.  (Pl.'s Aff. ¶ 39.[35])  Risco's

amended complaint is not part of the record.

### E.  Administrative Proceedings

On September 10 and 25, 2009, a fact finding conference was conducted at the Army

EEO office in West Point, New York.  (Bober Decl. Ex. C.)  Plaintiff was represented by counsel

at the hearing, during which she had the opportunity to examine witnesses, present evidence, and

make a closing statement.  (*Id.*)  The individuals who testified at the hearing were Risco, Byrd,

Bilello, Riddle, Rogers and Nancy Judd, who was one of the permanent guidance counselors in

the Education Center.  (*Id.*)

On May 28, 2010, the EEO Compliance and Complaints Review office issued the

Army's Final Agency Decision, finding that Risco was not the victim of discrimination or

retaliation.  (Def.'s 56.1 Stmt. ¶ 32; Bober Decl. Ex. R.)

---

[34] Rogers testified that she spoke to Risco about "the statements provided [and] the allegations of misconduct" and that Risco "denied that things happened the way they were [sic] and generally said that what was described in the written documentation wasn't really her and that she just didn't do [] any of the things that were mentioned in the letters."  (FFC Tr. 921:15-22)  Risco did not make any claims to Rogers about discrimination or retaliation.  (*Id.* 922:1-5, 943:10-944:13, 948:10-950:7.)

[35] The transcript of the fact finding conference indicates that Risco's complaint was amended on July 16, 2009. (FFC Tr. 6:10.)  It appears that the Risco added a retaliation claim based on her termination (*Id.* 14:5-17:14); however, the transcript is unclear, and there is no other evidence regarding the amended complaint in the record.

**II. Summary Judgment Standard**

   **A.  General Summary Judgment Standard**

 Summary judgment is only appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno*, 812 F. Supp. 2d at 467 (citing *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the relevant law. *Id.*   The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Cordiano v. Metacon Gun Club*, 575 F.3d 199, 204 (2d Cir. 2009) (citing *Celotex Corp.*, 477 U.S. at 322-23).

 The burden then shifts to the party opposing summary judgment to present evidence that is sufficient to satisfy every element of the claim and "designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. 317 at 324 (quotation marks omitted). "Summary judgment is properly granted when the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Abramson v. Pataki,* 278 F.3d 93, 101 (2d Cir. 2002) (quoting *Celotex Corp.,* 477 U.S. at 322).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.,* No. 09 Civ. 4551, 2011 WL 2750916, at \*7 (2d Cir. July 18, 2011) (quoting *Williams v. R.H. Donnelley, Corp.,* 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving part may not rely on unsupported assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  A motion for summary judgment cannot be defeated on the basis of mere denials or unsupported alternative explanations of facts. *Senno*, 812 F. Supp. 2d at 467 (citing *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir. 1998)).  The non-moving party must do more than show that there is "'some metaphysical doubt as to the material facts,'" *McClellan v. Smith,* 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)), "[she] must set forth significant, probative evidence on which a reasonable fact-finder could decide in [her] favor."  *Senno*, 812 F. Supp. 2d at 467-68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

## B.  Additional Summary Judgment Standards for Employment Discrimination Cases

Courts are cautious in granting summary judgment in employment discrimination cases where the employer's intent is at issue, *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008); however, "'summary judgment is appropriate even in discrimination cases, for . . . the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials— apply no less to discrimination cases than to other areas of litigation.'" *Hongyan Lu v. Chase Inv. Serv. Corp.,* 412 Fed. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.,* 224 F.3d 33, 41 (2d Cir. 2000), *superseded by statute on other grounds as stated in Ochei v. Coler/Goldwater Mem'l Hosp.,* 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)).  Indeed, "'[i]t is now

beyond cavil that summary judgment may be appropriate even in the fact-intensive context of

discrimination cases.'" *Feingold v. New York,* 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-*

*Brisson v. Delta Air Lines*, 239 F.3d 456, 466 (2d Cir. 2001)).  Furthermore, "[e]ven in the

discrimination context, [] a plaintiff must provide more than conclusory allegations to resist a

motion for summary judgment." *Holcomb*, 521 F.3d at 137; *Meiri v. Dacon*, 759 F.2d 989, 998

(2d Cir. 1985).  A "nonmoving party 'must offer some hard evidence showing that its version of

the events is not wholly fanciful.'"  *Jeffreys*, 426 F.3d at 554 (quoting *D'Amico v. City of New*

*York*, 132 F.3d 145, 149 (2d Cir. 1998)).

"[S]ummary judgment may not be granted simply because the court believes that the

plaintiff will be unable to meet his or her burden of persuasion at trial. There must either be a

lack of evidence in support of the plaintiff's position or the evidence must be so overwhelmingly

tilted in one direction that any contrary finding would constitute clear error." *Danzer v. Norden*

*Sys.*, 151 F.3d 50, 54 (2d Cir. 1998) (citations omitted).  "Nonetheless, when an employer

provides convincing evidence to explain its conduct and the plaintiff's argument consists of

purely conclusory allegations of discrimination, the Court may conclude that no material issue of

fact exists and it may grant summary judgment to the employer." *Walder v. White Plains Bd. of*

*Educ.*, 738 F. Supp. 2d 483, 493 (S.D.N.Y. 2010) (citing *Budde v. H & K Distrib. Co.,* No. 99–

9449, 216 F.3d 1071, 2000 WL 900204, at *1 (2d Cir. June 29, 2000)); *see also Stern v. Trs. of*

*Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997) (same); *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d

372, 375 (2d Cir. 1995) (same).

### III. Legal Standard for Title VII Claims

The parties agree that Risco's Title VII discrimination and retaliation claims are properly analyzed under the three-step burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).  (Pl.'s Mem. 5; Def.'s Mem. 11.)

Under the *McDonnell Douglas* framework, a plaintiff alleging discrimination under Title VII must first demonstrate a *prima facie* case of discrimination.  *McDonnell Douglas Corp.*, 411 U.S. at 802.  The Second Circuit has explained that a plaintiff's burden at this stage is minimal. *Abdu-Brisson,* 239 F.3d at 467.  Nonetheless, in order to state a *prima facie* case for discrimination, "a plaintiff must proffer some admissible evidence of circumstances that would be sufficient to permit an inference of discriminatory motive," *Bennett v. Watson Wyatt & Co.,* 136 F. Supp. 2d 236, 246 (S.D.N.Y. 2001), *aff'd,* 51 Fed App'x 55 (2d Cir. 2002), and cannot meet its burden through reliance on unsupported assertions.  *Goenaga,* 51 F.3d at 18. "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."  *Griffin v. Ambika Corp.,* 103 F. Supp. 2d 297, 308 (S.D.N.Y. 2000).  A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge, is also insufficient.  *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Civ. 9959(WHP), 2008 WL 4308126, *3 (S.D.N.Y. Sept. 17, 2008) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)), *aff'd*, 604 F.3d 713 (2d Cir. 2010).

If a plaintiff successfully presents a *prima facie* case of discrimination, the defendant must then rebut the presumption by offering legitimate and non-discriminatory reasons for the adverse employment action demonstrated in plaintiff's *prima facie* case.  *Abdu-Brisson,* 239 F.3d at 468 (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  The

defendant's burden at this step in the analysis is also "light."  *Greenway v. Buffalo Hilton Hotel,* 143 F.3d 47, 52 (2d Cir. 1998).  "The employer need not *persuade* the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior."  *Id.*  "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'"  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 509 (1993)).  To satisfy the second step of *McDonnell Douglas*, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Burdine*, 450 U.S. at 254.

"If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted," and "drops from the case."  *Id.* at 255, 255 n.10.  Under the third step of the *McDonnell Douglas* framework, the burden then shifts back to the plaintiff to prove intentional discrimination by a preponderance of the evidence.  *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 121 (2d Cir. 1997).  The Second Circuit has explained that "there are two distinct ways for a plaintiff to prevail—'either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions.'"  *Gordon v. N.Y. City Bd of Educ.,* 232 F.3d 111, 117 (2d Cir. 2000) (quoting *Fields*, 115 F.3d at 121).[36]  It is important to note, that "[a]lthough intermediate

---

[36] In *Fields*, the Second Circuit explained that:

> Though there are sentences in some opinions to the effect that a Title VII plaintiff must prove "*both* that the [defendant's proffered] reason was false, *and* that discrimination was the real reason," these decisions do not require a finding of pretext in addition to a finding of discrimination; they make the quite different point that a Title VII plaintiff may not prevail by establishing only pretext, but must prove, in addition, that a motivating reason was discrimination. But though a plaintiff may not prevail only by showing that a proffered explanation is a pretext, it is not required to make such a showing.

evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Reeves*, 530 U.S. at 143 (quoting *Burdine,* 450 U.S. at 253).

## IV. Discrimination on the Basis of Race and Color

Title VII prohibits employment-related discrimination on the basis of race, color, religion, sex or national origin.  42 U.S.C.A. § 2000e-2(a).

### A.  Prima Facie Case of Discrimination

In order to state a *prima facie* case of discrimination, a plaintiff must show that:  (1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination.  *Ruiz v. Cnty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  A plaintiff may raise an inference of discrimination for the purposes of making out a *prima facie* case by relying on the theory of disparate treatment; that is, by showing that her employer treated her less favorably than a similarly situated employee outside her protected group.  *Mandell v. Cnty. of Suffolk,* 316 F.3d 368, 379 (2d Cir. 2003).

The Second Circuit has explained that a plaintiff seeking to meet her initial burden by a showing of disparate treatment must demonstrate that she is "similarly situated in all material respects" to the individuals with whom she seeks to compare herself.  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  What constitutes "all material respects" varies from case to case, but "must be judged based on [] whether the plaintiff and those he maintains were similarly

---

115 F.3d at 121 (internal citations omitted) (quoting *St. Mary's Honor Ctr.,* 509 U.S. at 515, 511); *see also Gordon*, 232 F. 3d at 117 ("It is therefore now settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.").

situated were subject to the same workplace standards . . . ." *Id.* at 40.  The standard requires "a reasonably close resemblance of facts and circumstances" and there must be an objectively identifiable basis for comparability.  *Id.*; *see also McGuinness v. Lincoln Hall*, 263 F. 3d 49, 54 (2d Cir. 2001) ("[W]here a plaintiff seeks to establish the minimal *prima facie* case by making reference to the disparate treatment of other employees, those employees must have a situation sufficiently similar to plaintiff's to support at least a minimal inference that the difference of treatment may be attributable to discrimination.").

In addition to identifying similarly situated employees who are subject to the same performance evaluation and discipline standards, a plaintiff must also show that those employees engaged in acts of comparable seriousness but were not punished as severely as plaintiff. *Graham*, 230 F.3d at 40; *see also Carter v. New Venture Gear*, 310 Fed. App'x 454, 457 (2d Cir. 2009).  A proposed comparator is not similarly situated "in all material respects" unless she engaged in all of the same misconduct as plaintiff, or at least committed the most serious of the infractions for which the plaintiff was subjected to an adverse employment action.  *Jenkins v. St. Luke's-Roosevelt Hosp. Ctr.,* No. 09 Civ. 12(RMB)(MHD), 2009 WL 3682458, at *7-8 (S.D.N.Y. Oct. 29, 2009) (comparator was not similarly situated where he did not engage in "all of the same misconduct" as plaintiff); *see also Tomasino v. Mount Sinai Med. Ctr. & Hosp.,* No. 97 Civ. 5252(TPG), 2003 WL 1193726, at *7 (S.D.N.Y. Mar. 13, 2003) (comparators were not similarly situated to plaintiff where none committed the most serious of the infractions for which plaintiff was discharged).

A plaintiff may also present a disparate treatment discrimination claim based on her employer's failure to train her or provide her with equal access to training.  To prevail, a plaintiff must show that her employer offered the training to similarly situated employees, and that she

was denied that training under circumstances that give rise to an inference of discrimination. *Fincher*, 2008 WL 4308126, at *3; *Ani v. IMI Sys.*, No. 98 Civ. 8430 (DAB) (MHD), 2002 WL 1888873, at *6 (S.D.N.Y. Aug. 15, 2002).

### B.  Claims of Discrimination

Risco does not claim that she suffered any discrimination prior to March 2009; nor is there any indication in the record that Risco complained of discriminatory conduct prior to that time.[37]  Rather, her discrimination claims arise out of conduct that began to occur following her initial contact with the Army EEO office.[38]  (Pl.'s Aff. ¶¶ 23-24; Pl.'s Mem. 1-3; Def.'s 56.1 Stmt. ¶ 29.)

Risco claims that the Defendant discriminated against her on the basis of her race and color when she was terminated for behaving erratically, threatening others with violence, and failing to perform her work in an adequate manner, because Plaintiff claims that she did not behave erratically, threaten anyone with violence, or under-perform at work.  (Pl.'s Mem. 5-6.) Plaintiff also alleges that she was subject to disparate treatment as compared to "white males who did not suffer from any disability," based on the fact that Byrd failed to timely provide her with performance standards or a mid-year performance review, that she was denied training opportunities, and that Byrd relied on allegedly false statements regarding her conduct in recommending her termination.  (*Id.* 6-8.)

Risco further alleges that she was treated differently than her co-workers because she was the only Hispanic, "dark-skinned person" in the Education Center.  (*Id.* 7; *see, e.g.*, Risco Dep.

---

[37] Although the EEO Counselor's Report of Risco's informal complaint refers to harassment starting in February 2009 (Sussman Aff. Ex. 13, at 2), the report also lists May 14, 2009, the day she was placed on administrative leave, as the date of the alleged discrimination.  (*Id.* at 1.)

[38] The initial date of Risco's contact with the Army EEO office is not identified in the record.

55:18-21, 77:11-14; FFC Tr. 35:12-16, 88:13-89:5.[39])  Risco claims that Byrd would have

handled their interpersonal problems differently if she had been a light-skinned, Caucasian

employee.  (FFC Tr. 45:8-11, 110:18-21.)

Defendant argues that he is entitled to summary judgment on Plaintiff's race and color

discrimination claims because:  (1) Risco has failed to identify any similarly situated employee

outside her protected group who was treated more favorably, and (2) Plaintiff fails to satisfy the

fourth element of a *prima facie* case in that she cannot offer any direct evidence sufficient to give

rise to an inference of discrimination on the basis of race or color.[40]  (Def.'s Mem. 12-14; Def.'s

Reply Mem. 3-6.)  Defendant does not address whether Plaintiff has satisfied the first three

elements of a *prima facie* case of discrimination.[41]

---

[39] Although Risco testified about being treated differently on this basis during the fact finding conference and at her deposition, she failed to submit that testimony as part of her evidence.  *See supra* note 2.  The Second Circuit has instructed courts to consider only the plaintiff's evidence in determining whether she has met her initial burden under the *McDonnell Douglas* framework.  This direction arose, however, in reversing a district court's finding that plaintiff had failed to make a *prima facie* case because the plaintiff had not submitted evidence to rebut evidence offered by the defendant that was harmful to plaintiff.  *Graham*, 230 F.3d at 42; *see also Senno*, 812 F. Supp. 2d at 476 (following *Graham*'s instruction to ignore defendant's evidence that undercut plaintiff's *prima facie* case); *Conway v. Microsoft Corp.*, 414 F. Supp. 2d 450, 460 (S.D.N.Y. 2006) (same).  In opposing the instant motion, Plaintiff failed to include some of the evidence in the record that is necessary and/or helpful to her claims; therefore, in the interest of deciding this matter on the merits, the Court will consider evidence submitted by Defendant that is necessary and/or helpful to Plaintiff in determining whether her initial burden has been met.

[40] Defendant also disputes the sufficiency of allegations that Risco made during sworn testimony about purportedly derogatory comments she attributes to Byrd (Def.'s Mem. 13), which were not included in either of her EEO complaints, and which she no longer relies on.  The testimony describing the remarks was not included in the evidence submitted by Plaintiff.  *See also infra* note 54.  However, even if Risco had relied on the incidents addressed by Defendant, the Second Circuit has held that stray remarks alone do not constitute sufficient evidence of discrimination to survive a motion for summary judgment.  *Danzer*, 151 F.3d at 56; *see also Dixon v. Int'l Fed'n of Accountants*, 416 Fed. App'x 107, 110 (2d Cir. 2011) (same).

[41] Since the ultimate burden of persuading the trier of fact that Defendant intentionally discriminated against her is on Risco, Defendant can meet its burden of demonstrating that there is no genuine issue of material fact for trial by pointing to a lack of evidence to support an essential element of Plaintiff's claim.  *Cordiano*, 575 F.3d at 204 (citing *Celotex Corp.*, 477 U.S. at 322-23).

### C.  Discussion

#### 1.  Disparate Treatment

With respect to Plaintiff's claims of disparate treatment, Risco has failed to identify *any* comparators with whom she claims she was similarly situated.  She has provided "no factual support that a single alleged comparator performed similar job functions, was subjected to the same disciplinary standards, engaged in similar conduct, or was treated more favorably."  *Abdul-Hakeem v. Parkinson*, No. 3:10-cv747 (JBA), 2012 WL 234003, at *5 (D. Conn. Jan. 25, 2012). Risco's general claim that "basic rules of the workplace applied to Risco and her co-workers," including "being treated in an honest manner by one's superior," and "being given the same treatment with regard to the dissemination of an employee's performance standards" (Pl.'s Mem. 8), does not demonstrate that Risco was similarly situated "in all material respects" to her co-workers in the Education Center.  The Second Circuit has clearly explained that the plaintiff must be "subject to the same performance evaluation and discipline standards" as the employees who she claims are similarly situated.  *Ruiz*, 609 F.3d at 493-94.  In this case, Risco was the only probationary employee in the Education Center.  As a probationary employee, Risco was subject to being disciplined and even terminated in a more summary fashion and was therefore not similarly situated to her co-workers who were permanent employees.  *Woods v. Newburgh Enlarged City Sch. Dist.*, 288 Fed. App'x 757, 760 (2d Cir. 2008) ("*Woods II*") (proposed comparison did not support inference of racial bias where plaintiff was a probationary employee and proposed comparator was tenured).

Apart from the assertion that she behaved "as others did when she called co-workers 'pet names' early in her employment" (Pl.'s Mem. 6),[42] Risco also has not alleged that any of her co-workers engaged in the same conduct as she did and were treated more favorably.  Although Risco claims that no white male employees were falsely accused of being violent, denied timely performance standards, or subjected to false write-ups (*id.* 6-8), this conclusory, unsupported, and generalized allegation is clearly insufficient to sustain her burden even at the *prima facie* stage.  *Woods*, 473 F. Supp. 2d at 524-25 (holding that plaintiff's assertion that she was not aware of any past or present white employees in her position who had experienced similar treatment was clearly insufficient to meet initial burden); *see also Ruiz*, 609 F.3d at 495 ("Because [plaintiff] has not identified a similarly-situated employee who faced equally serious allegations and whom [the employer] allowed to remain on the job, [plaintiff] has failed to raise an inference of discrimination."); *Carter*, 310 Fed. App'x at 457 (affirming district court's finding that plaintiff failed to establish fourth element of *prima facie* case where plaintiff provided no evidence that "similarly situated black workers were punished differently than white co-workers for actual, comparable incidents."); *Cruz v. Coach Stores*, 202 F.3d 560, 568 (2d Cir. 2000) (finding that plaintiff failed to establish that she was similarly situated to non-Hispanic comparators, because other employees identified by plaintiff had engaged in less serious conduct and the plaintiff had failed to produce evidence that any non-Hispanic employees who engaged in comparably serious conduct were not terminated).

With respect to Risco's claim of disparate treatment based on unequal access to training, the only specific training opportunity that Risco claims she was denied is a conference that was

---

[42] Risco testified that one more senior co-worker at the Education Center had called Byrd "Papa Bird," but Risco did not know the co-worker's name and testified that the individual was transferred to a different office to work under Bilello shortly after Risco was hired.  (Risco Dep. 86:17-87:7.)

scheduled to occur in July or August 2009.  (Risco Dep. 73:19-75:8; FFC Tr. 339:19-341:8;

Sussman Aff. Ex. 9)  While Risco did not identify *any* other employees who were offered that

training, let alone employees who she claims were similarly situated, a review of the entire

record reveals that Risco previously testified that Neil Sakumoto, a permanent guidance

counselor, received the training that she was denied.  (Risco Dep. 75:9-21.[43])  However, a

difference in training that results from a difference in assignments or position does not give rise

to an inference of discrimination.  *Fincher* 2008 WL 4308126, at *4 (citing *McLee v. Chrysler

Corp.,* 926 F. Supp.  443, 444 (S.D.N.Y. 1996)).  Risco has not offered any evidence to show

that the IMCOM Intern Coordinator and the IMCOM Regional Representative who decided not

to approve further training on May 14, 2009 did so because of her race or color.  (Sussman Aff.

Ex. 9.)  In fact, Risco has not even shown that those individuals were aware of Risco's race or

color.

      Risco's conclusory assertion that "[o]n June 16, 2009, Byrd denied my request for

training" (Pl.'s Aff. ¶ 37), is too vague and general to give rise to an inference of discrimination.

*Meiri*, 759 F.2d at 998 (holding that plaintiff's conclusory allegations that her employer

conspired to get rid of her, misconceived her work habits because of subjective prejudice against

her, and that she heard disparaging remarks about her protected group were insufficient to satisfy

the requirements of Rule 56(e)).  In short, Risco has offered no evidence to support her

speculative and generalized assertions that she was denied training opportunities because of her

race or color.

      Without the necessary evidence of similarly situated comparators, Risco cannot meet her

burden of demonstrating facts that give rise to an inference of discrimination on the basis of race

---

[43] Here, again, because Plaintiff has failed to submit evidence that supports her *prima facie* case, the Court relies on evidence submitted by Defendant that is helpful to Plaintiff.  *See supra* notes 2, 39.

or color under a disparate impact theory.  *Fincher*, 2008 WL 4308126, at *3 (holding that

plaintiff had failed to establish *prima facie* case of racial discrimination); *see also Garrett v.

Mazza*, No. 97 Civ. 9148 (BSJ), 2010 WL 653489, *7 (S.D.N.Y. Feb. 22, 2010) (holding that no

reasonable jury could find that plaintiff was terminated under circumstances giving rise to an

inference of discrimination where plaintiff had failed to identify any similarly situated white

comparators who were treated more favorably).

### 2.  Other Evidence of Discrimination

Since Risco has failed to demonstrate disparate treatment, her claims of discrimination on

the basis of race and color can only survive if she can point to some direct evidence that creates a

genuine issue of fact as to whether her termination was motivated by racial bias or animus.  The

record is devoid of any such evidence—beyond her simply saying it is so—because Risco has

not shown that any of the actions taken by Byrd or Bilello were because of her race or color.  For

example, Risco cites Byrd's failure to timely provide documentation concerning the performance

standards for her position as evidence of discrimination; however, Risco has admitted that she

did not think she was being subjected to discrimination during the first five months of her

employment, notwithstanding Byrd's undisputed failure to give her the written performance

standards for her position.  (Def.'s 56.1 Stmt. ¶ 29; FFC Tr. 963:12-17.)  There is otherwise no

evidence that Byrd failed to give Risco the performance standards because of her race or color.

She has also offered no evidence to support her assertions that she was denied training

opportunities because of her race or color.

Risco's claim that she was "falsely accused of workplace violence," and "subjected to

false write-ups" (Pl.'s Mem. 6-7), also does not give rise to an inference that Byrd's conduct was

motivated by bias.  As a matter of law, Risco's disagreement with her employer's evaluation of

her behavior or performance is not evidence of discriminatory intent.  *Jimoh v. Ernst & Young,* 908 F. Supp. 220, 226 (S.D.N.Y. 1995) (citing *Dister v. Cont'l Grp.*, 859 F.2d 1108, 1116 (2d Cir. 1988)).  "While plaintiff argues that her behavior during the incidents cited by defendants was appropriate and justified, a plaintiff's factual disagreement with the validity of an employer's non-discriminatory reason for an adverse employment decision does not, by itself, create a triable issue of fact."  *Fleming v. MaxMara USA*, 644 F. Supp. 2d 247, 266 (E.D.N.Y. 2009), *aff'd*, 371 Fed App'x 115, 117-18 (2d Cir. 2010); *see also Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 47 (D. Conn. 2011) ("[T]he fact that [plaintiff] disagreed with Defendant's conclusion that her behavior during the bathroom incident was inappropriate and violated the Workplace Violence Policy is alone insufficient to create a triable issue of fact.").  Even if Byrd did exaggerate or lie about Risco's conduct or performance, there is no evidence in the record to support a finding that he did so in order to conceal any prohibited motivation based on Risco's race or color.  *Grillo v. N.Y. City Transit Auth.,* 291 F.3d 231, 235 (2d Cir. 2002); *see also Duclair v. Runyon,* 166 F.3d 1200, 1998 WL 852867, at *3 (2d Cir. 1998) (concluding that the plaintiff failed to establish a *prima facie* case of discrimination when the evidence showed that the plaintiff's supervisor disliked him personally but never made a derogatory racial or ethnic remark).

The fact that Risco was the only Hispanic, dark-skinned employee in the Education Center during the ten months of her employment, and her unsupported assertion that Byrd would have treated her differently if she had been a light-skinned Caucasian, also does not supply sufficient evidence to establish a *prima facie* case of discrimination.  *Anderson v. Hertz Corp.,* 507 F. Supp. 2d 320, 329 (S.D.N.Y. 2007) (finding insufficient evidence for *prima facie* case where plaintiff was the only African-American at a particular site supervised by his superior for

a twelve-year period), *aff'd*, 303 Fed. App'x 946 (2d Cir. 2008); *see also Padob v. Entex Info. Serv.*, 960 F. Supp. 806, 813 (S.D.N.Y. 1997) (plaintiff's conclusory assertion that she was subjected to differential treatment because she was a woman did not create a genuine issue of material fact).  "Without considerably more analysis and interpretation of why and how it came to be that Plaintiff was the only [dark-skinned, Hispanic employee in her department], that fact in isolation is of limited value to the Court.  No rational finder of fact could use this piece of information alone to infer that Plaintiff's termination was based on impermissible racial animus." *Anderson*, 507 F. Supp. 2d at 329.

Risco's general assertion that she was "stripped [] of her job duties" (Pl.'s Aff. ¶ 30), is not supported by *any* evidence in the record.   Moreover, such an allegation, standing alone, would not give rise to an inference of discrimination even if she had submitted evidence to support this claim, especially in light of Risco's complaint to Byrd in March 2009 about being "overwhelmed" by her responsibilities and assigned duties that were beyond the scope of her job.

With respect to the immediate circumstances surrounding Risco's termination, there is no evidence in the record to support an inference of racial animus on the part of Ileen Rogers, the ultimate decision-maker.  *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, at 221-23 (2d Cir. 2004) (holding that plaintiff did not present evidence giving rise to an inference of racial discrimination where he showed a past pattern of racially hostile conduct by co-workers but failed to provide any evidence of bias on the part of the individuals who made the decision to discharge him), *superseded in part on other grounds by* Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071 (amending 42 U.S.C. § 1981); *Grillo,* 291 F.3d at 235 (dismissing Title VII claim for racial discrimination because plaintiff failed to submit evidence of racial animus on the part of those involved in his termination).

34

An employer has the prerogative to discharge an employee on the basis of subjective business judgments, for any reason that is not discriminatory; it is not the job of the Court to question the employer's means to achieve a legitimate goal. *Fleming v. MaxMara USA*, 371 Fed App'x 115, 117-18 (2d Cir. 2010) (citing *Dister*, 859 F.2d at 1116); *see also Burdine*, 450 U.S. at 259 ("The fact that a court may think that the employer misjudged the qualifications of the [employee] does not in itself expose him to Title VII liability.").  Plaintiff's argument that she did not engage in some of the conduct Defendant relied on as a legitimate reason for her termination is irrelevant so long as Defendant had a good faith belief that plaintiff had engaged in such conduct. *Hargett v. N.Y. City Transit Auth.*, 640 F. Supp. 2d 450, 475-76 (S.D.N.Y. 2009), *aff'd sub nom Hargett v. Metro. Transp. Auth.*, 381 Fed. App'x (2d Cir. 2010).  Here, not only did Defendant have a good faith belief in the conduct, the conduct itself is largely not disputed.  For example, while Risco characterizes certain of the incidents differently, she does not dispute that she called her supervisors and coworkers by pet names (Pl.'s Mem. 6); sent her coworkers an email about gossip in the workplace (Def.'s 56.1 Stmt. ¶ 12); said "where I come from, she [McPeak] would be disciplined by her mother, father, brother, sister, she would probably be slapped by her mother, brother, father, sister" for making a comment that Risco found offensive (Risco Dep. 96:14-19; FFC Tr. 144:1-9); resigned without explanation and then rescinded her resignation three days later (Def.'s 56.1 Stmt. ¶¶ 16, 18); and accused Byrd of monitoring her email account.  (*Id.* ¶ 19.)

In sum, Risco has not submitted any evidence to show that any of the conduct she complains of was undertaken because of her race or color.  Plaintiff merely describes her "alleged mistreatment and ask[s] the court to conclude that it must have been related to [her] race. This is not sufficient." *Grillo,* 291 F.3d at 235 (quoting *Lizardo v. Denny's, Inc.*, 270 F.3d

94, 104 (2d Cir. 2001)) (alterations added) (internal quotation marks omitted); *see also Gonzales,* 262 F. Supp. 2d at 353 (finding plaintiff's self-serving statement that she was given more work than her co-workers, without direct or circumstantial evidence to support the charge, insufficient to defeat a motion for summary judgment). Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination on the basis of race or color, and summary judgment on those claims is appropriate.

Moreover, even if, assuming *arguendo*, Plaintiff had established a *prima facie* case of discrimination, the Court finds that summary judgment is still appropriate, because Defendant's assertion that Risco was fired because of her increasingly erratic conduct is sufficient to satisfy the burden of producing a legitimate, non-discriminatory reason for the termination,[44] *Meiri*, 759 F.2d at 997 (examples of probationary employee's inappropriate conduct were sufficient to satisfy employer's burden of production); *see also Sampson*, 415 U.S. at 64 (noting that probationary employees can be terminated without being afforded the greater procedural protections that are given to permanent employees), and Risco has failed to offer any evidence that Defendant's decision was actually motivated by discriminatory intent. *Farias v. Instructional Sys.*, 295 F.3d 91, 98-99 (2d Cir. 2001) (affirming summary judgment on discrimination claim where "[p]laintiffs failed to produce any evidence, other than conclusory statements unsupported by the record, to rebut the legitimate, nondiscriminatory reasons offered by [defendant], let alone evidence that could reasonably support a verdict in their favor.").

**V. Disability Claims**

With respect to Risco's discrimination, retaliation and hostile work environment claims on the basis of a physical and/or perceived mental disability, the Court finds *sua sponte* that

---

[44] As discussed further below, the only adverse employment action that Risco conceivably suffered was her termination. *See infra* Section VI.C.3.

Risco has failed to state any cognizable claims on this basis.[45]  Risco's Complaint only alleges

violations of Title VII.  (Compl. ¶¶ 46-47.)  Title VII does not prohibit discrimination on the

basis of disability.  *Prince v. Westchester Cnty. Dep't of Health,* No. 90 CIV. 2506 (TPG), 1992

WL 123170, at *4 (S.D.N.Y. May 27, 1992); *see also Julian v. N.Y. City Trans. Auth.,* 857 F.

Supp. 242, 250 (E.D.N.Y. 1994) (same), *aff'd,* 52 F.3d 312 (2d Cir. 1995); 42 U.S.C. §

12101(a)(4) (explaining that Congress was enacting the ADA, in part, because "unlike

individuals who have experienced discrimination on the basis of race, color, sex, national origin,

religion, or age, individuals who have experienced discrimination on the basis of disability have

often had no legal recourse to redress such discrimination").

    Although Plaintiff refers to her "ADA claim" in opposing Defendant's Motion for

Summary Judgment (Pl.'s Mem. 9), the Complaint does not contain any references to the

Americans with Disabilities Act ("ADA"), let alone a claim that Defendant violated the ADA.

Even if the Complaint contained such a claim, it would not survive a motion to dismiss.  As a

federal employee, Risco has no remedy for employment discrimination under the ADA.  *See* 42

U.S.C. § 12111(5)(B) (explicitly excluding the United States from the definition of "employer").

Her sole claim for discrimination on the basis of disability would be under Section 501 of the

Rehabilitation Act ("RHA"), if anywhere.  29 U.S.C. § 794a.  However, Risco has not alleged

any violations of the RHA in either her Complaint or in her summary judgment papers.

Therefore, Risco has failed to state a cognizable claim for discrimination, retaliation, or a hostile

work environment on the basis of a physical or perceived mental disability.  *Clark v. City of*

---

[45] The Second Circuit has recognized that, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir. 1968); *see also Eastway Constr. Corp. v. City of New York,* 762 F.2d 243, 250 (2d Cir. 1985) (although district court relied on affidavits in support of Rule 56 motion, and thus granted summary judgment, "it would have been equally proper to dismiss the civil rights count for failure to state a claim").

*Dublin*, 178 Fed. App'x 522, 524 (6th Cir. 2006) (holding that plaintiff cannot bring disability

discrimination claims under Title VII).

Even if Risco had stated a cognizable claim for disability discrimination under the RHA,

summary judgment would be appropriate because she has not established a *prima facie* case of

discrimination on the basis of a disability.  In order to state a *prima facie* case of discrimination

under the RHA, a federal employee must show, among other things, that she is disabled within

the meaning of the RHA.  *De La Rosa v. Potter*, 427 Fed. App'x 28, 28 (2d Cir. 2011).  The

RHA defines disability, with respect to an individual, as:  (i) a physical or mental impairment

that substantially limits one or more major life activities; (ii) a record of such an impairment; or

(iii) being regarded as having such an impairment.  42 U.S.C. § 12102(1) (incorporated in 29

U.S.C.A. § 705(20)(B)).[46]  An individual meets the requirement of "being regarded as having

such an impairment" if she is subjected to a prohibited action because of an actual or perceived

physical or mental impairment whether or not the impairment limits or is perceived to limit a

major life activity.  42 U.S.C. § 12102(3)(A); *see also* 29 C.F.R. §1630.2(l)(1).  The definition

explicitly excludes impairments that are transitory and minor.  42 U.S.C. § 12102(3)(B).

While Risco avers that her physical impairments prevented her from "engaging in

activities like lifting and running and other major life activities of a physical nature" (Pl.'s Aff. ¶

10), this assertion is expressly contradicted by her prior sworn testimony.  Specifically, Risco

previously testified that her physical disabilities did not impede her ability to walk (FFC Tr.

61:10-12, 63:10-14, 193:2-3); jog (*id.* 194:4-5); lift up to 35 pounds (*id.* 193:6-7); bend (*id.*

---

[46] The RHA defines disability by incorporating the definition set forth in the ADA, 29 U.S.C. § 705(20)(B), and the standards used to determine whether section 501 of the RHA has been violated are the standards set forth in the regulations concerning the ADA.  29 U.S.C. § 794(d); 29 C.F.R. § 1614.203(b); *see also Stone v. City of Mount Vernon,* 118 F.3d 92, 96 (2d Cir. 1997) ("The terms common to both [the ADA and the RHA] are to be interpreted in the same way.")

193:6); sit for long periods of time (*id.* 193:7); use stairs (*id.* 195:12-16); exercise (*id.* 191:17-20); talk (*id.* 61:13-15, 193:6-7); eat (*id.* 61:19-21); see (*id.* 193:10); hear (*id.* 193:11); take care of herself (*id.* 61:16-18); or interact with other people.[47]   (*Id.* 193:19-20).  Risco also testified that her physical impairments did not impede her ability to do her job (*id.* 61:4-9, 62:20-21, 191:15-16, 229:9-13, 979:3-5, 983:1-3; Risco Dep. 37:7-10, 38:22-24; 51:6-12), and that her doctors had not told her that she could not engage in any particular activities because of her physical conditions.[48]   (FFC Tr. 194:10-21.)  Risco has not submitted any evidence to support her assertion that her physical conditions substantially impaired her ability to engage in major life activities as defined in the RHA.  "It is well settled that the party opposing summary judgment may not create a triable issue of fact 'merely by submitting an affidavit that disputes his own prior sworn testimony.'  Rather such affidavits are to be disregarded."  *Rojas*, 783 F. Supp. 2d at 406-07 (quoting *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996)); *see also Jeffreys*, 426 F.3d at 554-55 (same) (citing *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 468-71 (S.D.N.Y. 1998) (Sotomayor, J.), *aff'd*, 205 F.3d 1324 (2d Cir. 2000)).  Additionally, Risco has also not made any claims based on a denial of accommodation for her physical conditions (*see, e.g.*, FFC Tr. 68:14-17, 963:3-4; Risco Dep. 38:9-12, 52:7-9), and she did not make any references to her physical impairments in discussing her "ADA claim."  (Pl.'s Mem. 9.)

---

[47] While Risco also testified that she could not lift "over 50 pounds" (FFC Tr. 61:6-9), this limitation would not constitute a substantial impairment within the meaning of the RHA.  29 C.F.R. § 1630.2(j)(1)(ii) ("An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.").

[48] Although the prior sworn testimony cited above was  not included with Plaintiff's evidence—which consisted of short and confusingly excerpted selections of her prior testimony and the testimony of others at the FFC hearing—the Second Circuit's instruction in *Graham, see supra* note 39, cannot mean that a Plaintiff who submits an affidavit that contradicts her prior sworn testimony can establish a *prima facie* case of discrimination by deliberately omitting the inconsistent portions of her prior sworn testimony from the evidence submitted to the Court.  *See also Rojas*, 783 F. Supp. 2d at 406-07; *Jeffreys*, 426 F.3d at 554-55.

Plaintiff has also failed to state a *prima facie* case of discrimination under the "regarded as" prong of the RHA, because she has not shown that she was subjected to an adverse employment action because of a perceived mental impairment that is not both transitory and minor.  29 C.F.R. § 1630.2(g), (l).  Even under the expanded definition of disability set forth in the ADA Amendments Act of 2008, Pub. L. No. 110–325, 122 Stat. 3553 (Sept. 25, 2008), Risco's assertions that Byrd referred to her inability to do a task as a "mental thing" and described her inappropriate behavior as "erratic" (Pl.'s Mem. 9), do not demonstrate that Byrd regarded Risco as having a mental impairment within the meaning of the statute.  *Sibilla v. Follett Corp.*, No. CV 10-1457 (AKT), 2012 WL 1077655, at *9 (E.D.N.Y. Mar. 30, 2012).  In fact, Plaintiff submitted testimony given by Byrd during the FFC hearing that specifically contradicts such a claim:

> Q: Well, did you believe that she was suffering from some kind of psychological illness at [the time Risco left the unusual voice message]?
>
> A: No.  I don't know.  I'm not qualified to say.
>
> Q: . . . . My question is whether you believe because of that voicemail or other alleged erratic behavior that [Risco] was suffering from some kind of psychological illness.
>
> A: I don't think she's mentally ill.  I've never implied that.

FFC Tr. 435:7-19.[49]

Additionally, Risco has offered no evidence to show that she was terminated *because* Byrd regarded her as being mentally impaired.  "Establishing that an individual is 'regarded as having such an impairment' does not, by itself establish liability.  Liability is established under title I of the ADA only when an individual proves that [her employer] discriminated on the basis

---

[49] Although not included as part of Plaintiff's evidence, the Court notes that when Byrd was asked if he ever formed the opinion that Risco was suffering from some type of mental condition because of her "paranoid tendencies," he again testified: "No, I don't think she's mentally ill."  (FFC Tr. 508:6-11.)

of disability within the meaning of section 102 of the ADA, 42 U.S.C. 12112." 29 C.F.R. § 1630.2(l)(3).  An isolated remark made approximately four months before Risco's termination outside of the relevant decision-making context, and a description of Risco's conduct as "erratic," are not evidence of discriminatory intent.  *Danzer,* 151 F.3d at 56 ("Stray remarks, even if made by a decision maker, do not constitute sufficient evidence [to support] a case of employment discrimination."); *see also Dixon*, 416 Fed. App'x at 110 (same).

It is undisputed that Risco was terminated because her employer concluded that she had failed to demonstrate the requisite fitness and qualification for continued employment as a guidance counselor based on behavior that Defendant deemed inappropriate.  (Def.'s 56.1 Stmt. ¶ 26.)  "[O]n-the-job misconduct and poor work performance always constitute legitimate and nondiscriminatory reasons for terminating employment, even where the misconduct is caused by an undivulged psychiatric condition."  *Canales-Jacobs v. N.Y. State Office of Court Admin.,* 640 F. Supp. 2d 482, 500 (S.D.N.Y. 2009) (citing *Raytheon v. Hernandez,* 540 U.S. 44, 54 n.6 (2003)).

Therefore, even if Risco had stated a claim for discrimination under the RHA, the claim still would not survive the instant motion.

## VI. Retaliation Claim

Title VII also makes it unlawful for an employer to discriminate against an employee by retaliating against her because she has "opposed" a practice that Title VII forbids.  42 U.S.C.A. § 2000e–3(a).  An employer violates Title VII when a retaliatory motive contributes to an adverse employment action, even if it is not the sole cause of the action.  *Terry v. Ashcroft,* 336 F.3d 128, 140-41 (2d Cir. 2003)  But a retaliatory motive must be at least a "substantial" or "motivating

factor" behind the adverse action.  *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) (citing

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

Risco asserts that she engaged in protected activity on March 27, 2009 when "she plainly

complained to the agency EEO officer of disability-related discrimination."  (Pl.'s Mem. 11.)

Risco alleges that Defendant retaliated against her for contacting the EEO office when, "within

six weeks of complaining to her employer's EEO officer on  March 27, 2009," Byrd:  (1)

solicited adverse statements about her from her co-workers; (2) recommended her termination

for "false, concocted reasons, including the highly disparaging claim she was a threat to the

workplace;" (3) placed her on paid administrative leave; (4) prepared two "false" counseling

memoranda about her; (5) stripped her of her job duties following the paid administrative leave;

(6) isolated her at work; and (7) ultimately terminated her probationary employment.[50]  (Pl.'s

Mem. 11-12.)  Plaintiff alleges that Byrd had knowledge of her contact with the Army EEO

office in March, and relies on the temporal proximity between her March 27, 2009 email to

Burnett and the purportedly retaliatory actions to establish the requisite causal connection.  (*Id.*)

## A.  Prima Facie Case of Retaliation

Retaliation claims under Title VII are evaluated under the *McDonnell Douglas* three-step

burden-shifting test.  *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir. 2005).  To

establish a *prima facie* case of retaliation under Title VII, an employee must show that:  (1) she

was engaged in a protected activity; (2) the defendant was aware of the protected activity; (3) she

suffered a materially adverse action; and (4) there is a causal connection between her protected

---

[50] Contrary to Plaintiff's assertion that the alleged retaliation occurred during a six-week period beginning on March 27, 2009 (Pl.'s Mem. 11), the evidence in the record establishes that the conduct complained of—at least the conduct that Plaintiff properly established—occurred between late April and early July 2009.  *See supra* note 2; *infra* note 52.  As noted below, only the conduct that occurred after Risco made her informal EEO complaint on May 15, 2009 could conceivably be considered retaliatory.  *See infra* note 52.

activity and the materially adverse action.  *Lore v. City of Syracuse*, 670 F.3d 127, 157 (2d Cir.

2012).  These four elements will be addressed in turn.

### 1.  Protected Activity

While a protected activity generally involves the filing of a formal complaint of

discrimination with an administrative agency, *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957

F.2d 59, 65 (2d Cir. 1992), the Second Circuit has recognized that "protected activity" includes

"informal protests of discriminatory employment practices, including making complaints to

management."  *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990).  However, such

informal complaints must be sufficiently specific to make it clear that the employee is

complaining about conduct prohibited by Title VII.  Generalized complaints about a supervisor's

treatment are insufficient.  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d

Cir. 2011) ("*Rojas II*") (affirming district court's holding that plaintiff failed to state a *prima*

*facie* case of retaliation because generalized complaint was not protected activity).

"[C]omplaints centered on general allegations of harassment unrelated to race [] are not

protected activity under Title VII."  *Thomas v. iStar Fin.*, 438 F. Supp. 2d 348, 365 (S.D.N.Y.

2006) (holding that complaints about supervisor's treatment, such as complaint that supervisor

falsely accused plaintiff of sexually harassing a co-worker, could not form basis of retaliation

claim), *aff'd*, 629 F.3d 276 (2d Cir. 2010); *see also Ruhling v. Tribune Co.*, No. CV 04-2430

(ARL), 2007 WL 28283, at *21 (E.D.N.Y. Jan. 3, 2007) (holding that an internal complaint of

favoritism was not protected activity where plaintiff had not framed complaint as involving

discriminatory conduct).

However, a plaintiff is not required to show that the conduct she opposed was in fact

unlawful; it is sufficient if the plaintiff had a good faith, reasonable belief that she was opposing

a practice prohibited by Title VII. *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006); *see also Wimmer v. Suffolk Cnty.*, 176 F.3d 125, 134 (2d Cir. 1999) (explaining that plaintiff "need not prove that the conditions against which he protested actually amounted to a violation of Title VII.").

   Risco's assertion that she engaged in protected activity on March 27, 2009 when she "plainly complained to the agency EEO officer of disability-related discrimination" is not supported by any evidence offered by Plaintiff.  In fact, her assertion is "plainly" contradicted by her sworn and undisputed testimony that she did not believe she was being discriminated against when she contacted the Army EEO office in March 2009.  (Def.'s 56.1 Stmt. ¶ 29 (citing Risco Dep. 40:6-9).)

   In any event, Risco's March 27, 2009 email cannot satisfy the "protected activity" requirement of her *prima facie* case for two reasons.  First, Risco's complaint was too generalized.  *See Rojas II*, 660 F.3d at 103, 108 (plaintiff's complaint that co-worker was "making her life miserable" was too vague to be protected activity).  Risco merely informed Burnett about Byrd's alleged remark ("It's probably mental"), and stated her desire to meet with Byrd and an EEO representative to discuss his remark.  (Sussman Aff. Ex. 5.)  Therefore, Defendant could not have reasonably understood her to be complaining of discrimination.  Second, even if, assuming *arguendo*, Risco's email was clearly framed in terms of discriminatory conduct, a complaint about disability-related discrimination cannot form the basis of a retaliation claim under Title VII, *Thomas*, 438 F. Supp. 2d at 365, and Plaintiff did not assert an unlawful retaliation claim under the RHA.

   Therefore, the Court finds that the first instance of "protected activity" for the purpose of demonstrating a *prima facie* case of retaliation was the informal complaint of discrimination that

Risco made on May 15, 2009.[51]  (Sussman Aff. Ex. 13.)  In that informal complaint, Risco

clearly allege that she was discriminated against on the basis of her race.  (*Id.*)

### 2.  Employer Knowledge

In order to satisfy the requirement of employer knowledge, an employee must have made

it clear that she was opposing activity made illegal by Title VII.  *Galdieri-Ambrosini*, 136 F.3d at

292.  "[I]mplicit in the requirement that the employer have been aware of the protected activity is

the requirement that it understood, or could reasonably have understood, that plaintiff's

opposition was directed at conduct prohibited by Title VII."  *Id.*  To satisfy this requirement, a

plaintiff is not required to show that the individual decision-makers had knowledge of her

protected activity; it is sufficient if the corporate entity has been put on notice of plaintiff's

complaint of conduct violating Title VII.  *Gordon*, 232 F.3d at 116.

The Second Circuit has established that general corporate knowledge is sufficient to

satisfy the second element of a *prima facie* case of retaliation.  *Id.*  An individual decision-

maker's lack of knowledge of Risco's protected activity does not undermine Defendant's

knowledge of her informal EEO complaint.  *Alston v. N.Y. City Transit Auth.*, 14 F. Supp. 2d

308, 311 (S.D.N.Y. 1998) (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.

1996)).  Thus, while Risco has offered no evidence to demonstrate that Byrd, Bilello or Rogers

---

[51]  Risco has not claimed that the memo she sent to Bilello on May 7, 2009, requesting a transfer and complaining that Byrd had subjected her to discrimination and retaliation (Def.'s 56.1 Stmt. ¶ 22), satisfies the protected activity element of her *prima facie* case, and there is no admissible evidence of the memo in Plaintiff's submissions.  *See supra* note 2.  However, the Court has considered the May 7 memo (which *was* properly submitted as admissible evidence by Defendant) *sua sponte* and finds that it is too generalized to have provided Defendant with reasonable notice that Plaintiff was complaining of any conduct prohibited by Title VII.  *Rojas II*, 660 F.3d at 107-08 (citing *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998)).  The memo states: "I request a transfer from the Army Education Center, USAG-West Point due to suffering the following conditions [sic] attributed to my supervisor, Mr. David Byrd: Discrimination, Unfair treatment-(Silent Treatment), Isolation, No Guidance, No Training, Offensive Remarks, Personal Retaliation for previously going up the Chain of Command.  I do not feel safe, secure or comfortable in the office spaces [sic]."  (Bober Decl. Ex. L (punctuation added)).

were aware of the informal complaint that she filed on May 15, 2009, she was not required to

show that any individual decision-maker knew that she had filed an EEO complaint to sustain

her retaliation claim.  *Id.* at 311 (holding that filing and maintenance of internal EEO complaint

put employer on notice of protected activity).  Accordingly, the second element is satisfied by

the filing of the informal EEO complaint as of May 15, 2009.

### 3.  Materially Adverse Employment Action

A materially adverse action for purposes of a retaliation claim is one that "a reasonable

employee would have found . . .  materially adverse, which in this context means it well might

have dissuaded a reasonable worker from making or supporting a charge of discrimination."

*Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68 (2006) (citation and quotation marks

omitted).  As the Supreme Court stated in *White*, "[t]he antiretaliation provision [of Title VII]

protects an individual not from all retaliation, but from retaliation that produces an injury or

harm."  *Id.* at 67.  Thus, the Court explained that "[w]e speak of *material* adversity because we

believe it is important to separate significant from trivial harms.  Title VII [] does not set forth 'a

general civility code for the American workplace.'"  *Id.* at 68 (quoting *Oncale v. Sundowner

Offshore Servs.*, 523 U.S. 75, 80 (1998)).  "An employee's decision to report discriminatory

behavior cannot immunize that employee from those petty slights or minor annoyances that often

take place at work and that all employees experience . . . personality conflicts at work that

generate antipathy and snubbing by supervisors and co-workers are not actionable under [Title

VII].'"  *Id.* (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d

ed.1996)) (internal quotation marks omitted).

The Supreme Court also emphasized the importance of applying an objective standard for

judging the alleged harm, referring to how a *reasonable* employee would react rather than to the

plaintiff's subjective reaction.  *Id.* at 67-69.  "'[A] plaintiff's subjective feelings cannot be used to determine whether an employment action is adverse.'"  *Jones v. N.Y. City Bd. of Educ.*, No. 09 Civ. 4815, 2012 WL 1116906, at *10 (S.D.N.Y. Apr. 2, 2012) (quoting *Islamic Soc'y of Fire Dep't Pers. v. City of New York*, 205 F. Supp. 2d 75, 84 (E.D.N.Y. 2002)).

None of the actions Plaintiff identified as "prohibited retaliation" constitute adverse actions under the governing case law in this Circuit.  The first three purportedly adverse actions Risco identified—soliciting adverse statements from her co-workers, recommending her termination, and placing her on administrative leave—occurred prior to her protected activity on May 15, 2009 and therefore cannot be considered retaliatory.  The preparation of two counseling memoranda, which does post-date May 15, 2009, is insufficient to establish a materially adverse action as a matter of law.  *Cody v. Cnty. of Nassau,* 345 Fed. App'x 717, 719 (2d Cir. 2009) (holding that "(1) falsely accusing [plaintiff] of being absent without authorization, (2) threatening her with future counseling notices and disciplinary actions, (3) writing her up for leaving work early, (4) placing her on a medical review list, (5) issuing her a counseling notice while she was on leave, and (6) engaging in a pattern of conduct that created a hostile working environment including altercations" were not adverse employment actions for purposes of a retaliation claim); *see also Thomas*, 438 F. Supp. 2d at 366 (formal verbal warning based on allegedly false information provided by plaintiff's supervisor did not constitute materially adverse action).  Risco has offered no evidence to support her additional allegations that Byrd stripped her of her job duties when she returned from administrative leave or that he isolated her at work.[52]  Therefore, the only materially adverse action that Risco conceivably suffered subsequent to engaging in protected activity was her termination on July 10, 2009.

---

[52] The only evidence submitted by Plaintiff to support her claim that Byrd stripped her of any job duties is contained in Plaintiff's Affidavit, wherein Risco avers that this diminution in job responsibilities occurred by late April or

### 4.  Causation

To satisfy the fourth requirement for a *prima facie* case of retaliation a plaintiff can establish the causal connection between the protected activity and an adverse employment action either directly, by offering evidence of retaliatory animus, or indirectly, by demonstrating that the protected activity was followed in close proximity by the adverse treatment.  *Cobb v. Pozzi,* 363 F.3d 89, 108 (2d Cir. 2004).  "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"  *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001); *see also Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.,* 252 F.3d 545, 554-555, 555 n.5 (2d Cir. 2001) (collecting cases); *Woods,* 473 F. Supp. 2d at 528-29 (same).

At the *prima facie* stage, a plaintiff can rely solely on temporal proximity to establish the requisite causal connection between her protected activity and the materially adverse action that she allegedly suffered in retaliation for engaging in that activity.  Here, the less than two-month temporal relationship between the protected activity and Risco's termination is sufficiently proximate to support an inference of causation.  *Gorman-Bakos,* 252 F.3d at 554.  *Cf. Ponticelli*

---

early May.  (Pl.'s Aff. ¶¶ 29-30).  In addition to being wholly conclusory, this allegation places the allegedly retaliatory conduct prior to Risco's protected activity, rendering it immaterial to her Title VII retaliation claim.  The Court notes, but is required to disregard, Plaintiff's inconsistent and unsupported assertion in her Memorandum of Law that Byrd stripped her of her job duties upon her return from administrative leave at the end of May.  (Pl.'s Mem. 7.)  The claim that Byrd "isolated her at work" is similarly based solely on Plaintiff's Affidavit wherein she avers that "Byrd alienated other unit employees from me by asking them to provide adverse and critical statements about me."  (Pl.'s Aff. ¶ 24.)  Since Risco does not have personal knowledge of Byrd's solicitation of such statements from her co-workers, the Court must disregard her characterization of the solicited statements.  *See supra* note 2.  Additionally, the admissible evidence in the record establishes that Byrd was instructed to collect the statements in the second half of March 2009, and that all of the statements were written between April 21, 2009 and May 4, 2009.  (FFC Tr. 317:3-19, 466:14-468:5, 475:2-476:2, 479:15-480:3; Bober Decl. Ex. F.)  Since the statements were solicited and written prior to May 15, 2009, they cannot be relied on as evidence of retaliation for Risco's May 15, 2009 informal complaint.

*v. Zurich Am. Ins. Grp.,* 16 F. Supp. 2d 414, 436 (S.D.N.Y. 1998) (finding two-and-a-half month lapse between complaint and adverse action insufficiently proximate to establish a retaliatory nexus).  Plaintiff's reliance on temporal proximity is unavailing, however, because Risco has alleged, and it is not disputed, that Byrd and Bilello gained the approval for her termination, in late April or early May 2009.  (Pl.'s Aff. ¶ 29; FFC Tr. 860:6-8, 964:20-965:3.)

The evidence submitted by Risco demonstrates that, at the very latest, Byrd had taken steps to discharge Risco as a probationary employee by May 1, 2009.  (Pl.'s Aff. ¶ 25; Sussman Aff. Ex. 3.)  Since Risco has established that her supervisors began the process of terminating her employment before she engaged in protected activity, she cannot rely on temporal proximity to satisfy the causal connection element of a *prima facie* case of Title VII retaliation.  *Breeden,* 532 U.S. at 272 (holding transfer one month after employer learned of protected activity "immaterial in light of the fact that [the employer] concededly was contemplating the transfer before it learned of the [protected activity].")  In *Breeden*, the Supreme Court explained that employers do not need to suspend previously planned employment actions upon learning that an employee has engaged in protected activity, "and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  *Id.*

Risco has offered no other evidence of a retaliatory motive to satisfy the casual connection requirement; therefore, she has not made a *prima facie* case of Title VII retaliation. "[A] plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causal link. Instead, [s]he must produce 'some tangible proof to demonstrate that [her] version of what occurred was not imaginary.'"  *Cobb,* 363 F.3d at 108 (quoting *Morris v. Lindau,* 196 F.3d 102, 111 (2d Cir. 1999)) (alterations added).

### VII. Hostile Work Environment

The Supreme Court has "repeatedly made clear that although [Title VII] mentions specific employment decisions with immediate consequences, the scope of the prohibition is not limited to economic or tangible discrimination, and that it covers more than terms and conditions in the narrow contractual sense." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002) (internal quotation marks and citations omitted).  In *Harris v. Forklift Systems*, the Supreme Court explained that the language of Title VII "evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment, which includes requiring people to work in a discriminatorily hostile or abusive environment."  510 U.S. 17, 21 (1993) (internal quotation marks omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64 (1986)).  Thus, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* (quoting *Meritor*, 477 U.S. at 65, 67) (internal citations omitted).[53]

Courts analyzing hostile work environment claims look at "all of the circumstances," including:  "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* at 23.  "Hence, '[a] recurring point in [Supreme Court] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'"  *Breeden,* 532 U.S. at 271 (quoting *Faragher v. Boca Raton,* 524 U.S. 775, 788 (1998)); *see also Harris*, 510 U.S. at 21 ("'mere utterance of an . . . epithet which engenders

---

[53] "Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment." *Morgan*, 536 U.S. at 116 n. 10.

offensive feelings in a employee,' does not sufficiently affect the conditions of employment to implicate Title VII.  Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview." (quoting *Meritor*, 477 U.S. at 67)).

## A.  Prima Facie Case

In order to state a *prima facie* case of a hostile work environment because of discrimination on the basis of race or color, a plaintiff must show that:  (1) the workplace was permeated with discriminatory harassment or intimidation that was sufficiently severe or pervasive to alter the conditions of her working environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  *Mack v. Otis Elevator Co.*, 326 F.3d 113, 122 (2d Cir. 2003).  The standard for stating a hostile work environment claim under Title VII is a demanding one.  Even where a plaintiff has successfully raised a genuine issue of material fact on the inference of discrimination that is required for a *prima facie* case of Title VII discrimination, a plaintiff must show *more* to establish the first element of a hostile working environment claim.  *See, e.g.*, *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189-90 (2d Cir. 1987) (finding genuine issue of material fact on inference of discrimination but not for claim of hostile work environment).

"The first element of a hostile work environment claim has both an objective and subjective component:  'the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.'"  *Carter*, 310 Fed App'x at 457-58 (quoting *Terry*, 336 F.3d at 148).  In addition, a plaintiff must demonstrate that the abusive conduct was motivated by animus towards a protected class.  *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir. 2001) ("It is

axiomatic that mistreatment at work . . . through subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic.").

       Defendant argues that summary judgment is appropriate because the conduct Risco complains of is insufficient to demonstrate an objectively hostile work environment, and because Risco cannot establish that any of the conduct occurred because of her race or color.[54]  Since Defendant did not address Risco's subjective perception of her work environment or her ability to establish the second element of her *prima facie* case, the Court's analysis will only focus on whether Risco's work environment could be deemed objectively hostile under the governing case law in this Circuit.

## B. Discussion

       Risco claims that she was subjected to a hostile work environment because, within a short period of time, Byrd:  (1) took statements from her co-workers; (2) recommended her termination; (3) placed her on paid administrative leave; (4) "reluctantly returned to her supervision;" (5) caused her to be given two "false" counseling memoranda; (6) stripped her of her duties; (7) refused to allow her further training; and (8) isolated her.  (Pl.'s Mem. 10.)  On their face, these actions are race-neutral.  While facially race-neutral incidents "may sometimes be used to establish a course of [race]-based discrimination—for example, where the same individual is accused of multiple acts of harassment, some overtly [racial] and some not," *Alfano*

---

[54] In discussing Risco's hostile work environment claim, Defendant again discusses the stray derogatory remarks that Risco alleged during prior sworn testimony.  (Def.'s Mem. 18.)  Risco does not rely on these allegations to support her hostile work environment claim.  *See also supra* note 40.  However, even if Risco had relied on the incidents addressed by Defendant, the Supreme Court has held that occasional off-color or inappropriate remarks with racial or ethnic undertones are insufficient to create an actionable hostile work environment under Title VII. *Breeden,* 532 U.S. at 272 (holding that no reasonable person could conclude that a hostile work environment existed based on a series of occasional and isolated remarks).

*v. Costello*, 294 F.3d 365, 375 (2d Cir. 2002), Risco has not alleged a single incident that is overtly or implicitly related to her race or color.  Risco also has not alleged that any of her co-workers made any derogatory remarks about her race or color.

In order for facially race-neutral incidents to be included in the totality of the circumstances considered by a court in analyzing a hostile work environment claim, there must be some basis for a reasonable fact-finder to conclude that those actions were in fact based on Risco's race.  "[T]his requires some circumstantial or other basis for inferring that incidents [race]-neutral on their face were in fact discriminatory."  *Id.* at 378.  Here, based on the evidence presented by Plaintiff, there is no reason to believe that any of Byrd's conduct was due to Risco's race or color.  As the Second Circuit explained in *Alfano*:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals. . . .

> Moreover, many personnel decisions can be ascribed to discrimination no matter what the supervisor does. Thus, it is easy to claim animus whether a supervisor resorts to counseling (if this is seen as a form of discipline) or not (if lack of guidance is deemed to set up an employee for harsher discipline). Similarly, it is easy to ascribe animus whether an employer prepares a memo after an event of discipline (if the memo is deemed an escalation in severity) or not (if the failure to prepare a memo is deemed a cover-up).

*Id.* at 377-78 (internal citations omitted).

Even if Risco had offered some proof that Byrd's conduct was motivated by racial animus, she cannot establish the existence of a hostile environment because the conduct she complains of was too isolated and limited in duration to establish an objectively hostile work environment.  *Lopez*, 831 F.2d at 1189 ("Because the claimed incidents in the instant case were

few in number and occurred over a short period of time, they fail to allege a racially hostile

working environment."); *see also Monterosso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d

567, 584 (S.D.N.Y. 2008) (allegation that co-worker referred to plaintiff as a "stupid Italian" on

several occasions held insufficient to support a hostile work environment claim). "As a general

rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted

in order to be deemed pervasive.'" *Terry*, 336 F.3d at 148 (quoting *Alfano,* 294 F.3d at 374).[55]

      Plaintiff also completely fails to support her assertion that the conduct leading up to her

discharge was sufficiently severe or pervasive to alter the conditions of her employment under

the objective and subjective standards set forth in *Petrosino v. Bell Atlantic*, 385 F.3d 210, 221

(2d Cir. 2004).  Indeed, Risco's reliance on *Petrosino* only serves to weaken her claim.  The

conduct found to be severe and pervasive in *Petrosino* included sexually demeaning

conversations conveying a profound disrespect for women that permeated the workplace,

constant exposure to sexually explicit graffiti, including an image of plaintiff performing a sex

act on a supervisor, constant exposure to hostile, gender-based comments about plaintiff's body

and gender generally (including remarks about her menstrual cycle affecting her job

performance), and an instance of physical sexual assault by a co-worker who subsequently

became plaintiff's direct supervisor, which was thereafter treated as a "big joke' by her co-

workers, all of which was continuous and pervasive for almost a decade.  385 F.3d at 214-15,

222-24.

---

[55] The Court notes that Risco also has not identified any single incident that is sufficiently severe to alone constitute
an intolerable alteration of her work environment. *Cruz,* 202 F.3d at 570.  *Cf. Howley v. Town of Stratford*, 217 F.3d
141, 154-55 (2d Cir. 2000) (holding that a rational juror could view a single incident involving a sexually explicit
and degrading barrage of insults directed at a female firefighter in front of her subordinates by a co-worker who also
ignored plaintiff's orders, spread untrue rumors that plaintiff sought to give older firefighters assignments that would
cause heart attacks, and raised questions as to her competence to be sufficiently severe to result in an intolerable
alteration to plaintiff's working conditions as a commanding officer).

Indeed, Risco's claims do not even approach the level of conduct present in other cases where courts have found *insufficient* evidence of severe or pervasive conduct to support a hostile work environment claim. *See Alfano,* 294 F.3d at 379 (collecting cases involving a greater number of incidents that were more severe and had more overtly discriminatory overtones that were held *insufficient* as a matter of law to alter the terms of plaintiff's employment for a hostile work environment claim). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view." *Faragher,* 524 U.S. at 788. "'[D]iscourtesy or rudeness should not be confused with racial harassment' and [] 'a lack of racial sensitivity does not, alone, amount to actionable harassment'" *Id.* at 787 (quoting 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn.36-37 (3d ed. 1996)).

## VIII. Conclusion

For the reasons discussed above, Defendant's motion for summary judgment is GRANTED.

The Clerk of the Court is respectfully directed to enter judgment in favor of Defendant.

It is SO ORDERED.

Dated:   June 14, 2012
         White Plains, New York

                                        Edgardo Ramos, U.S.D.J.